## STRATE, ASSOCIATE TRIBAL JUDGE, TRIBAL COURT OF THE THREE AFFILIATED TRIBES OF THE FORT BERTHOLD INDIAN RESERVATION, ET AL. *v.* A–1 CONTRACTORS ET AL.

No. 95–1872.   Argued January 7, 1997—Decided April 28, 1997

440

*Melody L. McCoy* argued the cause for petitioners. With her on the brief was *Donald R. Wharton.*

*Jonathan E. Nuechterlein* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler,* and *Edward J. Shawaker.*

*Patrick J. Ward* argued the cause and filed a brief for respondents.*

---

*Briefs of *amici curiae* urging reversal were filed for the Assiniboine and Sioux Tribes of the Fort Peck Reservation et al. by *Reid Peyton Chambers;* for the Northern Plains Tribal Judges Association by *B. J. Jones;* for the Shakopee Mdewakanton Sioux (Dakota) Community et al. by *Kurt V. BlueDog* and *Richard A. Duncan;* and for the Yavapai-Apache Nation et al. by *Susan M. Williams* and *Gwenellen P. Janov.*

Briefs of *amici curiae* urging affirmance were filed for the State of Montana et al. by *Joseph P. Mazurek,* Attorney General of Montana, *Clay R. Smith,* Solicitor, and *Harley R. Harris,* Assistant Attorney General, joined by the Attorneys General for their respective jurisdictions as fol-

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the adjudicatory authority of tribal courts over personal injury actions against defendants who are not tribal members. Specifically, we confront this question: When an accident occurs on a portion of a public highway maintained by the State under a federally granted right-of-way over Indian reservation land, may tribal courts entertain a civil action against an allegedly negligent driver and the driver's employer, neither of whom is a member of the tribe?

Such cases, we hold, fall within state or federal regulatory and adjudicatory governance; tribal courts may not entertain claims against nonmembers arising out of accidents on state highways, absent a statute or treaty authorizing the tribe to govern the conduct of nonmembers on the highway in question. We express no view on the governing law or proper forum when an accident occurs on a tribal road within a reservation.

I

In November 1990, petitioner Gisela Fredericks and respondent Lyle Stockert were involved in a traffic accident on a portion of a North Dakota state highway running through the Fort Berthold Indian Reservation. The highway strip crossing the reservation is a 6.59-mile stretch of road, open to the public, affording access to a federal water resource project. North Dakota maintains the road under a right-of-

lows: *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *Alan G. Lance* of Idaho, *Scott Harshbarger* of Massachusetts, *Mike Moore* of Mississippi, *Frankie Sue Del Papa* of Nevada, *Dennis C. Vacco* of New York, *Mark Barnett* of South Dakota, *Jan Graham* of Utah, *Christine O. Gregoire* of Washington, *James E. Doyle* of Wisconsin, and *William U. Hill* of Wyoming; for Lake County, Montana, et al. by *Jon Metropoulos;* for the American Trucking Associations, Inc., et al. by *Michele Odorizzi, Andrew J. Pincus,* and *Daniel R. Barney;* and for the Council of State Governments et al. by *Richard Ruda* and *Charles F. Lettow.*

way granted by the United States to the State's Highway Department; the right-of-way lies on land held by the United States in trust for the Three Affiliated Tribes (Mandan, Hidatsa, and Arikara) and their members.

The accident occurred when Fredericks' automobile collided with a gravel truck driven by Stockert and owned by respondent A–1 Contractors, Stockert's employer. A–1 Contractors, a non-Indian-owned enterprise with its principal place of business outside the reservation, was at the time under a subcontract with LCM Corporation, a corporation wholly owned by the Tribes, to do landscaping work related to the construction of a tribal community building. A–1 Contractors performed all work under the subcontract within the boundaries of the reservation.[1] The record does not show whether Stockert was engaged in subcontract work at the time of the accident. Neither Stockert nor Fredericks is a member of the Three Affiliated Tribes or an Indian. Fredericks, however, is the widow of a deceased member of the Tribes and has five adult children who are tribal members.[2]

Fredericks sustained serious injuries in the accident and was hospitalized for 24 days. In May 1991, she sued respondents A–1 Contractors and Stockert, as well as A–1 Contractors' insurer, in the Tribal Court for the Three Affiliated Tribes of the Fort Berthold Reservation. In the same lawsuit, Fredericks' five adult children filed a loss-of-consortium

---

[1] Respondents state that the subcontract had forum-selection and choice-of-law provisions selecting Utah state courts and Utah law for dispute resolution. See Brief for Respondents 2. Petitioners do not contest this point, but the subcontract is not part of the record in this case.

[2] The Court of Appeals for the Eighth Circuit stated that petitioner Fredericks resides on the reservation. See 76 F. 3d 930, 932 (1996) (en banc). Respondents assert, however, that there is an unresolved factual dispute regarding Fredericks' residence at the time of the accident. See Brief for Respondents 1–2, n. 2; Brief in Opposition 3, n. 4. Under our disposition of the case, Fredericks' residence at the time of the accident is immaterial.

claim. Together, Fredericks and her children sought damages exceeding $13 million. App. 8–10.

Respondents and the insurer made a special appearance in the Tribal Court to contest that court's personal and subject-matter jurisdiction. The Tribal Court ruled that it had authority to adjudicate Gisela Fredericks' case, and therefore denied respondents' motion to dismiss the action. *Id.*, at 24–25.[3] Respondents appealed the Tribal Court's jurisdictional ruling to the Northern Plains Intertribal Court of Appeals, which affirmed. *Id.*, at 36. Thereafter, pursuant to the parties' stipulation, the Tribal Court dismissed the insurer from the suit. See *id.*, at 38–40.

Before Tribal Court proceedings resumed, respondents commenced this action in the United States District Court for the District of North Dakota. Naming as defendants Fredericks, her adult children, the Tribal Court, and Tribal Judge William Strate, respondents sought a declaratory judgment that, as a matter of federal law, the Tribal Court lacked jurisdiction to adjudicate Fredericks' claims. The respondents also sought an injunction against further proceedings in the Tribal Court. See *id.*, at 41–45.

Relying particularly on this Court's decisions in *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845 (1985), and *Iowa Mut. Ins. Co.* v. *LaPlante*, 480 U. S. 9 (1987), the District Court determined that the Tribal Court had civil jurisdiction over Fredericks' complaint against A–1 Contractors and Stockert; accordingly, on cross-motions for summary judgment, the District Court dismissed the action. App. 54–67. On appeal, a divided panel of the United States Court of Appeals for the Eighth Circuit affirmed. App. 68–90. The Eighth Circuit granted rehearing en banc and, in an 8-to-4 decision, reversed the District Court's judgment.

---

[3] Satisfied that it could adjudicate Gisela Fredericks' claims, the Tribal Court declined to address her adult children's consortium claim, App. 25; thus, no ruling on that claim is here at issue.

76 F. 3d 930 (1996). The Court of Appeals concluded that our decision in *Montana* v. *United States*, 450 U. S. 544 (1981), was the controlling precedent, and that, under *Montana*, the Tribal Court lacked subject-matter jurisdiction over the dispute.[4]

We granted certiorari, 518 U. S. 1056 (1996), and now affirm.

## II

Our case law establishes that, absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances. In *Oliphant* v. *Suquamish Tribe*, 435 U. S. 191 (1978), the Court held that Indian tribes lack criminal jurisdiction over non-Indians.[5] *Montana* v. *United States*, decided three years later, is the pathmarking case concerning tribal civil authority over nonmembers. *Montana* concerned the authority of the Crow Tribe to regulate hunting and fishing by non-Indians on lands within the Tribe's reservation owned in fee simple by non-Indians. The Court said in *Montana* that the restriction on tribal criminal jurisdiction recognized in *Oliphant* rested on principles that support a more "general proposition." 450 U. S., at 565. In the main, the Court explained, "the inherent sovereign powers of an Indian tribe"—those powers a tribe enjoys apart from express provision by treaty or statute—"do not extend to the activities

---

[4] Petitioner Fredericks has commenced a similar lawsuit in a North Dakota state court "to protect her rights against the running of the State's six-year statute of limitations." Reply Brief 6, n. 2. Respondents assert that they have answered the complaint and "are prepared to proceed in that forum." Brief for Respondents 8, n. 6. Respondents also note, without contradiction, that the state forum "is physically much closer by road to the accident scene . . . than [is] the tribal courthouse." *Ibid.*

[5] In *Duro* v. *Reina*, 495 U. S. 676, 684–685 (1990), we held that Indian tribes also lack criminal jurisdiction over nonmember Indians. Shortly after our decision in *Duro*, Congress provided for tribal criminal jurisdiction over nonmember Indians. See 25 U. S. C. § 1301(2).

of nonmembers of the tribe." *Ibid.* The *Montana* opinion added, however, that in certain circumstances, even where Congress has not expressly authorized it, tribal civil jurisdiction may encompass nonmembers:

> "To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.*, at 565–566 (citations and footnote omitted).

The term "non-Indian fee lands," as used in this passage and throughout the *Montana* opinion, refers to reservation land acquired in fee simple by non-Indian owners. See *id.*, at 548.

*Montana* thus described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation, subject to two exceptions: The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe's political integrity, economic security, health, or welfare. The *Montana* Court recognized that the Crow Tribe retained power to limit or forbid hunting or fishing by nonmembers on land still owned by or held in trust for the Tribe. *Id.*, at 557. The Court held, however, that the Tribe lacked authority to regulate hunting and fishing by non-Indians on land within the Tribe's

reservation owned in fee simple by non-Indians. *Id.*, at 564–567.[6]

Petitioners and the United States as *amicus curiae* urge that *Montana* does not control this case. They maintain that the guiding precedents are *National Farmers* and *Iowa Mutual,* and that those decisions establish a rule converse to *Montana*'s. Whatever *Montana* may instruct regarding *regulatory* authority, they insist, tribal courts retain *adjudicatory* authority in disputes over occurrences inside a reservation, even when the episode-in-suit involves nonmembers, unless a treaty or federal statute directs otherwise. Petitioners, further supported by the United States, argue, alternately, that *Montana* does not cover lands owned by, or held

---

[6] *Montana*'s statement of the governing law figured prominently in *Brendale* v. *Confederated Tribes and Bands of Yakima Nation,* 492 U. S. 408 (1989), and in *South Dakota* v. *Bourland,* 508 U. S. 679 (1993). The Court held in *Brendale,* 6 to 3, that the Yakima Indian Nation lacked authority to zone nonmembers' land within an area of the Tribe's reservation open to the general public; almost half the land in the area was owned in fee by nonmembers. The Court also held, 5 to 4, that the Tribe retained authority to zone fee land in an area of the reservation closed to the general public. No opinion garnered a majority. Justice White, writing for four Members of the Court, concluded that, under *Montana,* the Tribe lacked authority to zone fee land in both the open and closed areas of the reservation. 492 U. S., at 422–432. JUSTICE STEVENS, writing for two Justices, concluded that the Tribe retained zoning authority over nonmember land only in the closed area. *Id.*, at 443–444. Justice Blackmun, writing for three Justices, concluded that, under *Montana*'s second exception, the Tribe retained authority to zone fee land in both the open and the closed areas. *Id.*, at 456–459.

In *Bourland,* the Court considered whether the Cheyenne River Sioux Tribe could regulate hunting and fishing by non-Indians in an area within the Tribe's reservation, but acquired by the United States for the operation of a dam and a reservoir. We determined, dominantly, that no treaty or statute reserved to the Tribe regulatory authority over the area, see 508 U. S., at 697, and we left for resolution on remand the question whether either *Montana* exception applied, see 508 U. S., at 695–696; see also 39 F. 3d 868, 869–870 (CA8 1994) (decision of divided panel on remand that neither *Montana* exception justified regulation by the Tribe).

in trust for, a tribe or its members.  *Montana* holds sway, petitioners say, only with respect to alienated reservation land owned in fee simple by non-Indians.   We address these arguments in turn.

A

We begin with petitioners' contention that *National Farmers* and *Iowa Mutual* broadly confirm tribal-court civil jurisdiction over claims against nonmembers arising from occurrences on any land within a reservation.   We read our precedent differently.   *National Farmers* and *Iowa Mutual*, we conclude, are not at odds with, and do not displace, *Montana*.   Both decisions describe an exhaustion rule allowing tribal courts initially to respond to an invocation of their jurisdiction; neither establishes tribal-court adjudicatory authority, even over the lawsuits involved in those cases.   Accord, *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U. S. 408, 427, n. 10 (1989) (opinion of White, J.).

*National Farmers* involved a federal-court challenge to a tribal court's jurisdiction over a personal injury action initiated on behalf of a Crow Indian minor against a Montana school district.   The accident-in-suit occurred when the minor was struck by a motorcycle in an elementary school parking lot.   The school occupied land owned by the State within the Crow Indian Reservation.   See 471 U. S., at 847. The school district and its insurer sought a federal-court injunction to stop proceedings in the Crow Tribal Court.   See *id.*, at 848.   The District Court granted the injunction, but the Court of Appeals reversed, concluding that federal courts lacked subject-matter jurisdiction to entertain such a case. See *id.*, at 848–849.

We reversed the Court of Appeals' judgment and held that federal courts have authority to determine, as a matter "arising under" federal law, see 28 U. S. C. § 1331, whether a tribal court has exceeded the limits of its jurisdiction.   See 471 U. S., at 852–853.   We further held, however, that the fed-

eral suit was premature. Ordinarily, we explained, a federal court should stay its hand "until after the Tribal Court has had a full opportunity to determine its own jurisdiction." *Id.*, at 857. Finding no cause for immediate federal-court intervention,[7] we remanded the case, leaving initially to the District Court the question "[w]hether the federal action should be dismissed, or merely held in abeyance pending . . . further Tribal Court proceedings." *Ibid.*

Petitioners underscore the principal reason we gave in *National Farmers* for the exhaustion requirement there stated. Tribal-court jurisdiction over non-Indians in criminal cases is categorically restricted under *Oliphant*, we observed, while in civil matters "the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions." 471 U. S., at 855–856 (footnote omitted).

The Court's recognition in *National Farmers* that tribal courts have more extensive jurisdiction in civil cases than in criminal proceedings, and of the need to inspect relevant statutes, treaties, and other materials, does not limit *Montana's* instruction. As the Court made plain in *Montana*, the general rule and exceptions there announced govern only in the absence of a delegation of tribal authority by treaty or statute. In *Montana* itself, the Court examined the treaties and legislation relied upon by the Tribe and explained

---

[7] The Court indicated in *National Farmers* that exhaustion is not an unyielding requirement:

"We do not suggest that exhaustion would be required where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith,' or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction." 471 U. S., at 856, n. 21 (citation omitted).

why those measures did not aid the Tribe's case. See 450 U. S., at 557–563. Only after and in light of that examination did the Court address the Tribe's assertion of "inherent sovereignty," and formulate, in response to that assertion, *Montana*'s general rule and exceptions to it. In sum, we do not extract from *National Farmers* anything more than a prudential exhaustion rule, in deference to the capacity of tribal courts "to explain to the parties the precise basis for accepting [or rejecting] jurisdiction." 471 U. S., at 857.

*Iowa Mutual* involved an accident in which a member of the Blackfeet Indian Tribe was injured while driving a cattle truck within the boundaries of the reservation. 480 U. S., at 11. The injured member was employed by a Montana corporation that operated a ranch on reservation land owned by Blackfeet Indians residing on the reservation. See *ibid.* The driver and his wife, also a Tribe member, sued in the Blackfeet Tribal Court, naming several defendants: the Montana corporation that employed the driver; the individual owners of the ranch; the insurer of the ranch; and an independent insurance adjuster representing the insurer. See *ibid.* Over the objection of the insurer and the insurance adjuster—both companies not owned by members of the Tribe—the Tribal Court determined that it had jurisdiction to adjudicate the case. See *id.*, at 12.

Thereafter, the insurer commenced a federal-court action against the driver, his wife, the Montana corporation, and the ranch owners. See *ibid.* Invoking federal jurisdiction based on the parties' diverse citizenship, see 28 U. S. C. § 1332, the insurer alleged that it had no duty to defend or indemnify the Montana corporation or the ranch owners because the injuries asserted by the driver and his wife fell outside the coverage of the applicable insurance policies. See 480 U. S., at 12–13. The Federal District Court dismissed the insurer's action for lack of subject-matter jurisdiction, and the Court of Appeals affirmed. See *id.*, at 13–14.

We reversed. Holding that the District Court had diversity-of-citizenship jurisdiction over the insurer's complaint, we remanded, as in *National Farmers,* for a determination whether "the federal action should be stayed pending further Tribal Court proceedings or dismissed." 480 U. S., at 20, n. 14. The Court recognized in *Iowa Mutual* that the exhaustion rule stated in *National Farmers* was "prudential," not jurisdictional. 480 U. S., at 20, n. 14; see also *id.,* at 16, n. 8 (stating that "[e]xhaustion is required as a matter of comity, not as a jurisdictional prerequisite"). Respect for tribal self-government made it appropriate "to give the tribal court a 'full opportunity to determine its own jurisdiction.'" *Id.,* at 16 (quoting *National Farmers,* 471 U. S., at 857). That respect, the Court reasoned, was equally in order whether federal-court jurisdiction rested on § 1331 (federal question) or on § 1332 (diversity of citizenship). 480 U. S., at 17–18. Elaborating on the point, the Court stated:

> "Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. See *Montana* v. *United States,* 450 U. S. 544, 565–566 (1981); *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134, 152–153 (1980); *Fisher* v. *District Court [of Sixteenth Judicial Dist. of Mont.],* 424 U. S. [382,] 387–389 [(1976)].  Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute. . . . In the absence of any indication that Congress intended the diversity statute to limit the jurisdiction of the tribal courts, we decline petitioner's invitation to hold that tribal sovereignty can be impaired in this fashion." *Id.,* at 18.

Petitioners and the United States fasten upon the Court's statement that "[c]ivil jurisdiction over such activities presumptively lies in the tribal courts." Read in context, however, this language scarcely supports the view that the

*Montana* rule does not bear on tribal-court adjudicatory authority in cases involving nonmember defendants.

The statement stressed by petitioners and the United States was made in refutation of the argument that "Congress intended the diversity statute to limit the jurisdiction of the tribal courts." 480 U. S., at 18. The statement is preceded by three informative citations. The first citation points to the passage in *Montana* in which the Court advanced "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," 450 U. S., at 565, with two prime exceptions, *id.,* at 565–566. The case cited second is *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134 (1980), a decision the *Montana* Court listed as illustrative of the first *Montana* exception, applicable to "nonmembers who enter consensual relationships with the tribe or its members," 450 U. S., at 565–566; the Court in *Colville* acknowledged inherent tribal authority to tax "non-Indians entering the reservation to engage in economic activity," 447 U. S., at 153. The third case noted in conjunction with the *Iowa Mutual* statement is *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.,* 424 U. S. 382 (1976) *(per curiam),* a decision the *Montana* Court cited in support of the second *Montana* exception, covering on-reservation activity of nonmembers bearing directly "on the political integrity, the economic security, or the health or welfare of the tribe." 450 U. S., at 566. The Court held in *Fisher* that a tribal court had exclusive jurisdiction over an adoption proceeding when all parties were members of the tribe and resided on its reservation. See 424 U. S., at 383, 389. State-court jurisdiction over such matters, the Court said, "plainly would interfere with the powers of self-government conferred upon the . . . Tribe and exercised through the Tribal Court." *Id.,* at 387. The Court observed in *Fisher* that state courts may not exercise jurisdiction over disputes arising out of

on-reservation conduct—even over matters involving non-Indians—if doing so would "'infring[e] on the right of reservation Indians to make their own laws and be ruled by them.'" *Id.*, at 386 (citation omitted).

In light of the citation of *Montana*, *Colville*, and *Fisher*, the *Iowa Mutual* statement emphasized by petitioners does not limit the *Montana* rule. In keeping with the precedent to which *Iowa Mutual* refers, the statement stands for nothing more than the unremarkable proposition that, where tribes possess authority to regulate the activities of nonmembers, "[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts." 480 U. S., at 18.

Recognizing that our precedent has been variously interpreted, we reiterate that *National Farmers* and *Iowa Mutual* enunciate only an exhaustion requirement, a "prudential rule," see *Iowa Mutual*, 480 U. S., at 20, n. 14, based on comity, see *id.*, at 16, n. 8. These decisions do not expand or stand apart from *Montana*'s instruction on "the inherent sovereign powers of an Indian tribe." 450 U. S., at 565. While *Montana* immediately involved regulatory authority, the Court broadly addressed the concept of "inherent sovereignty." *Id.*, at 563. Regarding activity on non-Indian fee land within a reservation, *Montana* delineated—in a main rule and exceptions—the bounds of the power tribes retain to exercise "forms of civil jurisdiction over non-Indians." *Id.*, at 565. As to nonmembers, we hold, a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction. Absent congressional direction enlarging tribal-court jurisdiction, we adhere to that understanding. Subject to controlling provisions in treaties and statutes, and the two exceptions identified in *Montana*, the civil authority of Indian tribes and their courts with respect to non-Indian fee lands generally "do[es] not extend to the activities of nonmembers of the tribe." *Ibid.*

B

We consider next the argument that *Montana* does not govern this case because the land underlying the scene of the accident is held in trust for the Three Affiliated Tribes and their members. Petitioners and the United States point out that in *Montana,* as in later cases following *Montana*'s instruction—*Brendale* v. *Confederated Tribes and Bands of Yakima Nation,* 492 U. S. 408 (1989), and *South Dakota* v. *Bourland,* 508 U. S. 679 (1993), described *supra,* at 447, n. 6—the challenged tribal authority related to nonmember activity on alienated, non-Indian reservation land. We "can readily agree," in accord with *Montana,* 450 U. S., at 557, that tribes retain considerable control over nonmember conduct on tribal land.[8] On the particular matter before us, however, we agree with respondents: The right-of-way North Dakota acquired for the State's highway renders the 6.59-mile stretch equivalent, for nonmember governance purposes,[9] to alienated, non-Indian land.

Congress authorized grants of rights-of-way over Indian lands in 1948 legislation. Act of Feb. 5, 1948, ch. 45, 62 Stat. 17, 25 U. S. C. §§ 323–328. A grant over land belonging to a tribe requires "consent of the proper tribal officials," § 324,

---

[8] Petitioners note in this regard the Court's unqualified recognition in *Montana* that "the Tribe may prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe." 450 U. S., at 557. The question addressed was "the power of the Tribe to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe." *Ibid.;* see Brief for Petitioners 15–16.

[9] For contextual treatment of rights-of-way over Indian land, compare 18 U. S. C. § 1151 (defining "Indian country" in criminal law chapter generally to include "rights-of-way running through [a] reservation") with §§ 1154(c) and 1156 (term "Indian country," as used in sections on dispensation and possession of intoxicants, "does not include . . . rights-of-way through Indian reservations").

and the payment of just compensation, § 325.[10] The grant involved in this case was made, pursuant to the federal statute, in 1970. Its purpose was to facilitate public access to Lake Sakakawea, a federal water resource project under the control of the Army Corps of Engineers.

In the granting instrument, the United States conveyed to North Dakota "an easement for a right-of-way for the realignment and improvement of North Dakota State Highway No. 8 over, across and upon [specified] lands." App. to Brief for Respondents 1. The grant provides that the State's "easement is subject to any valid existing right or adverse claim and is without limitation as to tenure, so long as said easement shall be actually used for the purpose . . . specified." *Id.*, at 3. The granting instrument details only one specific reservation to Indian landowners:

> "The right is reserved to the Indian land owners, their lessees, successors, and assigns to construct crossings of the right-of-way at all points reasonably necessary to the undisturbed use and occupan[cy] of the premises affected by the right-of-way; such crossings to be constructed and maintained by the owners or lawful occupants and users of said lands at their own risk and said occupants and users to assume full responsibility for avoiding, or repairing any damage to the right-of-way, which may be occasioned by such crossings." *Id.*, at 3–4.

Apart from this specification, the Three Affiliated Tribes expressly reserved no right to exercise dominion or control over the right-of-way.

Forming part of the State's highway, the right-of-way is open to the public, and traffic on it is subject to the State's

---

[10] Rights-of-way granted over lands of individual Indians also require payment of compensation, 25 U. S. C. § 325, and ordinarily require consent of the individual owners, see § 324 (describing circumstances in which rights-of-way may be granted without the consent of owners).

control.[11]   The Tribes have consented to, and received payment for, the State's use of the 6.59-mile stretch for a public highway.   They have retained no gatekeeping right.   So long as the stretch is maintained as part of the State's highway, the Tribes cannot assert a landowner's right to occupy and exclude.   Cf. *Bourland*, 508 U. S., at 689 (regarding reservation land acquired by the United States for operation of a dam and a reservoir, Tribe's loss of "right of absolute and exclusive use and occupation . . . implies the loss of regulatory jurisdiction over the use of the land by others").   We therefore align the right-of-way, for the purpose at hand, with land alienated to non-Indians.   Our decision in *Montana*, accordingly, governs this case.

## III

Petitioners and the United States refer to no treaty or statute authorizing the Three Affiliated Tribes to entertain highway-accident tort suits of the kind Fredericks commenced against A–1 Contractors and Stockert.   Rather, petitioners and the United States ground their defense of tribal-court jurisdiction exclusively on the concept of retained or inherent sovereignty.   *Montana*, we have explained, is the controlling decision for this case.   To prevail here, petitioners must show that Fredericks' tribal-court action against nonmembers qualifies under one of *Montana*'s two exceptions.

The first exception to the *Montana* rule covers "activities of nonmembers who enter consensual relationships with the

---

[11] We do not here question the authority of tribal police to patrol roads within a reservation, including rights-of-way made part of a state highway, and to detain and turn over to state officers nonmembers stopped on the highway for conduct violating state law.   Cf. *State* v. *Schmuck*, 121 Wash. 2d 373, 390, 850 P. 2d 1332, 1341 (en banc) (recognizing that a limited tribal power "to stop and detain alleged offenders in no way confers an *unlimited* authority to regulate the right of the public to travel on the Reservation's roads"), cert. denied, 510 U. S. 931 (1993).

tribe or its members, through commercial dealing, contracts, leases, or other arrangements." 450 U. S., at 565. The tortious conduct alleged in Fredericks' complaint does not fit that description. The dispute, as the Court of Appeals said, is "distinctly non-tribal in nature." 76 F. 3d, at 940. It "arose between two non-Indians involved in [a] run-of-the-mill [highway] accident." *Ibid.* Although A–1 was engaged in subcontract work on the Fort Berthold Reservation, and therefore had a "consensual relationship" with the Tribes, "Gisela Fredericks was not a party to the subcontract, and the [T]ribes were strangers to the accident." *Ibid.*

*Montana's* list of cases fitting within the first exception, see 450 U. S., at 565–566, indicates the type of activities the Court had in mind: *Williams* v. *Lee,* 358 U. S. 217, 223 (1959) (declaring tribal jurisdiction exclusive over lawsuit arising out of on-reservation sales transaction between nonmember plaintiff and member defendants); *Morris* v. *Hitchcock,* 194 U. S. 384 (1904) (upholding tribal permit tax on nonmember-owned livestock within boundaries of the Chickasaw Nation); *Buster* v. *Wright,* 135 F. 947, 950 (CA8 1905) (upholding Tribe's permit tax on nonmembers for the privilege of conducting business within Tribe's borders; court characterized as "inherent" the Tribe's "authority . . . to prescribe the terms upon which noncitizens may transact business within its borders"); *Colville,* 447 U. S., at 152–154 (tribal authority to tax on-reservation cigarette sales to nonmembers "is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status"). Measured against these cases, the Fredericks-Stockert highway accident presents no "consensual relationship" of the qualifying kind.

The second exception to *Montana's* general rule concerns conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U. S., at 566. Undoubtedly, those

who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. But if *Montana*'s second exception requires no more, the exception would severely shrink the rule. Again, cases cited in *Montana* indicate the character of the tribal interest the Court envisioned.

The Court's statement of *Montana*'s second exceptional category is followed by citation of four cases, *ibid.;* each of those cases raised the question whether a State's (or Territory's) exercise of authority would trench unduly on tribal self-government. In two of the cases, the Court held that a State's exercise of authority would so intrude, and in two, the Court saw no impermissible intrusion.

The Court referred first to the decision recognizing the exclusive competence of a tribal court over an adoption proceeding when all parties belonged to the Tribe and resided on its reservation. See *Fisher*, 424 U. S., at 386; *supra*, at 452–453. Next, the Court listed a decision holding a tribal court exclusively competent to adjudicate a claim by a non-Indian merchant seeking payment from tribe members for goods bought on credit at an on-reservation store. See *Williams*, 358 U. S., at 220 ("[A]bsent governing Acts of Congress, the question [of state-court jurisdiction over on-reservation conduct] has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them."). Thereafter, the Court referred to two decisions dealing with objections to a county or territorial government's imposition of a property tax on non-Indian-owned livestock that grazed on reservation land; in neither case did the Court find a significant tribal interest at stake. See *Montana Catholic Missions* v. *Missoula County*, 200 U. S. 118, 128–129 (1906) ("the Indians' interest in this kind of property [livestock], situated on their reservations, was not sufficient to exempt such property, when owned by private individuals, from [state or territorial] taxation"); *Thomas* v. *Gay*, 169 U. S. 264, 273 (1898) ("[terri-

torial] tax put upon the cattle of [non-Indian] lessees is too remote and indirect to be deemed a tax upon the lands or privileges of the Indians").

Read in isolation, the *Montana* rule's second exception can be misperceived. Key to its proper application, however, is the Court's preface: "Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. . . . But [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations." 450 U. S., at 564. Neither regulatory nor adjudicatory authority over the state highway accident at issue is needed to preserve "the right of reservation Indians to make their own laws and be ruled by them." *Williams*, 358 U. S., at 220. The *Montana* rule, therefore, and not its exceptions, applies to this case.

Gisela Fredericks may pursue her case against A–1 Contractors and Stockert in the state forum open to all who sustain injuries on North Dakota's highway.[12] Opening the Tribal Court for her optional use is not necessary to protect tribal self-government; and requiring A–1 and Stockert to defend against this commonplace state highway accident claim in an unfamiliar court[13] is not crucial to "the political integrity, the economic security, or the health or welfare of the [Three Affiliated Tribes]." *Montana*, 450 U. S., at 566.[14]

---

[12] See *supra*, at 445, n. 4.

[13] Within the federal system, when nonresidents are the sole defendants in a suit filed in state court, the defendants ordinarily may remove the case to federal court. See 28 U. S. C. § 1441.

[14] When, as in this case, it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by *Montana*'s main rule, it will be equally evident that tribal courts lack adjudicatory authority over disputes arising from such conduct. As in criminal proceedings, state or federal courts will be the only forums competent to adjudicate those disputes. See *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845, 854 (1985). Therefore, when tribal-court juris-

\*     \*     \*

For the reasons stated, the judgment of the Court of Appeals for the Eighth Circuit is

*Affirmed.*

---

diction over an action such as this one is challenged in federal court, the otherwise applicable exhaustion requirement, see *supra*, at 449–450, must give way, for it would serve no purpose other than delay. Cf. *National Farmers*, 471 U. S., at 856, n. 21; *supra*, at 449, n. 7.