137 F.3d 1135
 46 ERC 1161, 28 Envtl. L. Rep. 21,033,
98 Cal. Daily Op. Serv. 1497,
98 Daily Journal D.A.R. 2077
 STATE OF MONTANA; Lake County, Montana, a political
subdivision of the State of Montana; City of Ronan,
Montana, a municipal corporation; Town of Hot Springs,
Montana, a municipal corporation, Plaintiffs,
and
Flathead Joint Board of Control, Mission Irrigation
District, Jocko Valley Irrigation District, Flathead
Irrigation District, local governments; Ross Middlemist,
Wayne Maughan, William Slack and Glenn Murphy,
Plaintiffs-Intervenors-Appellants,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, an agency of
the United States; Carol M. Browner, Administrator of the
United States Environmental Protection Agency; and the
Confederated Salish and Kootenai Tribes, Defendants-Appellees.
STATE OF MONTANA; Lake County, Montana; City of Ronan,
Montana, a municipal corporation; Town of Hot
Springs, Montana, a municipal
corporation, Plaintiffs-Appellants,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, an agency of
the United States; Carol M. Browner, Administrator of the
United States EPA; Confederated Salish and Kootenai Tribes
of the Flathead Reservation, Defendants-Appellees.
 Nos. 96-35505, 96-35508.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 8, 1997.
Decided March 3, 1998.
 
 Harley Harris, Assistant Attorney General, Helena, Montana, for plaintiffs-appellants.
 Lois J. Schiffer, Assistant Attorney General, Martin W. Matzen, David A. Carson, Kevin Washburn, U.S. Department of Justice, Environment and Natural Resources Division, on the briefs; Leigh Price, Assistant Regional Counsel, James J. Havard and Randolph L. Hill, Office of General Counsel, U.S. Environmental Protection Agency, of counsel, Washington, DC, for defendants-appellees.
 Daniel Decker, Marion Yoder, and John Carter, Tribal Legal Department, Confederated Salish and Kootenai Tribes of the Flathead Nation, Pablo, Montana, for tribal-appellees.
 Arthur Lazarus, Jr., Sonosky, Chambers, Sachse & Enderson, Washington, DC, amicus curiae for Assiniboine and Sioux Tribes of Fort Peck Reservation, Montana.
 Jon Metropoulos, Helena, Montana, for plaintiffs-intervenors-appellants.
 Jeanne S. Whiteing, Whiteing & Thompson, Boulder, Colorado, amicus curiae for Blackfeet Tribe.
 Sam W. Maynes, Maynes, Bradford, Shipps & Sheftel, Durango, Colorado, amicus curiae for Southern Ute Indian Tribe.
 Hans Walker, Jr., Hobbs, Straus, Dean & Walker, Washington, DC, amicus curiae for Three Affiliated Tribes of Fort Berthold Reservation, North Dakota.
 Thane P. Johnson, Werner, Epstein & Johnson, Cut Bank, Montana, amicus curiae for Montana Association of Counties.
 Thomas L. Dosch and John S. Greene, Assistant Attorneys General for the State of Wisconsin, Madison, WI, amici curiae for appellants.
 Jeffery R. Cutter, Lyon, Weigand & Gustafson, Yakima, Washington, amicus curiae for Yakima Reservation Irrigation District.
 Appeals from the United States District Court for the District of Montana; Charles C. Lovell, District Judge, Presiding. D.C. No. CV-95-00056-CCL.
 Before: SCHROEDER and BEEZER, Circuit Judges and SCHWARZER,* District Judge.
 SCHROEDER, Circuit Judge:
 
 
 1
 This case is a facial challenge to regulations the Environmental Protection Agency (EPA) promulgated pursuant to § 518(e) of the Clean Water Act, 33 U.S.C. § 1377 (Supp.1997). That section authorizes EPA to permit Indian tribes "to be treated as a state" (TAS) for purposes of promulgating water quality standards (WQS) pursuant to § 303 of the Act. 33 U.S.C. § 1313 (1986). The plaintiffs-appellants, collectively referred to as "Montana," include state and municipal entities who own fee interests in land located within the boundaries of the Flathead Indian Reservation. The Reservation is occupied by the Confederated Salish and Kootenai Tribes. The Tribes, along with EPA officials, are the defendants-appellees.
 
 
 2
 Montana filed this action attacking EPA's decision to grant TAS status to the Tribes to promulgate WQS that apply to all sources of pollutant emissions within boundaries of the Reservation, regardless of whether the sources are located on land owned by members or non-members of the Tribe. Montana maintained that the regulations permit tribes to exercise authority over non-members that is broader than the inherent tribal powers recognized as necessary to self-governance. See Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989); Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).
 
 
 3
 In addition, Flathead Irrigation District and related entities ("the Intervenors") have sought to intervene as of right in the action although their uses of the land are not sources of emissions regulated by the Clean Water Act.
 
 
 4
 The district court granted summary judgment to the defendants, and denied intervention by the Intervenors because they lacked any discernible interest in the subject matter of the litigation as required by Rule 24 of the Federal Rules of Civil Procedure. Montana and the Intervenors have each filed a separate appeal. We affirm in both.
 
 BACKGROUND
 The Clean Water Act
 
 5
 The Clean Water Act (CWA) prohibits discharges from a point source of any pollutant into waters unless the emission discharge complies with the Act's requirements. See 33 U.S.C. § 1311(a). For most discharges, such compliance is achieved by obtaining and adhering to the terms of a National Pollutant Discharge Elimination System (NPDES) permit. See 33 U.S.C. § 1342. NPDES permits are issued by EPA or, in those jurisdictions in which EPA has authorized a state agency to administer the NPDES program, by a state agency subject to EPA review. See 33 U.S.C. § 1342(b).
 
 
 6
 Under the NPDES program, each state must adopt WQS for its waters. See 33 U.S.C. § 1313. These standards are subject to review and approval by EPA. See 33 U.S.C. § 1313(a)-(c). Once WQS have been adopted, EPA will issue an NPDES permit only if the relevant state certifies that any discharges under the proposed permit will be consistent with its WQS. See 33 U.S.C. § 1341(a).
 
 
 7
 In 1987, Congress added § 518(e) to the CWA which authorized EPA to permit tribes "to be treated as a state" (TAS) for purposes of promulgating WQS. 33 U.S.C. § 1377(e). The relevant language of the provision is set forth in the margin.[1]
 
 
 8
 EPA issued a final rule in 1991 implementing the provision by setting forth the standards for processing tribal requests for TAS status and concomitant authority to institute WQS. See Environmental Protection Agency, 56 Fed.Reg. 64,876 (1991) (codified at 40 C.F.R. § 131.8(b)(3)) (hereinafter Final Rule). The Final Rule was promulgated after notice and comment, during which Montana voiced its objections to the rule as too broad. Conversely, some tribal interests, represented in this case by amici briefs, took the position that the authority was too narrow, and that Congress had in effect delegated the power to the tribes to promulgate WQS. EPA rejected both extremes and promulgated the regulations here at issue:
 
 
 9
 1. The tribe must be federally recognized and exercising governmental authority;
 
 
 10
 2. The tribe must have a governing body carrying out "substantial governmental duties and powers;"
 
 
 11
 3. The water quality standards program which the tribe seeks to administer must "pertain to the management and protection of water resources," which are "within the borders of an Indian reservation;"
 
 
 12
 4. The Indian tribe is reasonably expected to be capable of carrying out the functions of an effective water quality standards program in a manner consistent with the terms and purposes of the Clean Water Act and regulations.
 
 
 13
 40 C.F.R. 131.8(a).
 
 
 14
 The third requirement, with which we are principally concerned, is intended to reflect the scope of a tribe's "inherent power," a concept developed by the Supreme Court to define when tribes may engage in nonconsensual regulation of activities of non-members. See Montana, 450 U.S. at 565-66, 101 S.Ct. at 1258; United States v. Wheeler, 435 U.S. 313, 322, 98 S.Ct. 1079, 1085-86, 55 L.Ed.2d 303 (1978).
 
 
 15
 To demonstrate authority over the activities of non-members on non-Indian fee lands, EPA requires a tribe to show that the regulated activities affect "the political integrity, the economic security, or the health or welfare of the tribe." Final Rule, 56 Fed.Reg. at 64,877 (quoting Montana, 450 U.S. at 566, 101 S.Ct. at 1258). The potential impacts of regulated activities on the tribe must be "serious and substantial." Id. at 64,878.
 
 
 16
 EPA believes that tribes will normally be able to demonstrate that the impacts of regulated activities are serious and substantial due to "generalized findings" on the relationship between water quality and human health and welfare. See id. Nonetheless, under the Final Rule EPA will make a case-specific determination on the scope of each tribal applicant's authority. See id. Because EPA's generalized findings will be incorporated into the analysis of tribal authority, the factual showing required under § 131.8 is limited to the tribe's assertion that (1) there are waters within the reservation used by the tribe, (2) the waters and critical habitat are subject to protection under CWA, and (3) impairment of waters would have a serious and substantial effect on the health and welfare of the tribe. See id. at 64,879.
 
 
 17
 Once the tribe meets this initial burden, EPA will, in light of the facts presented by the tribe and the generalized statutory and factual findings regarding the importance of reservation water quality, presume that there has been an adequate showing of tribal jurisdiction over fee lands. See id. Unless the party objecting demonstrates the tribe's lack of jurisdiction, the EPA will determine there is inherent authority. See id.
 
 
 18
 THE FLATHEAD RESERVATION APPLICATION AND APPROVAL FOR TAS STATUS
 
 
 19
 In 1992, the Tribes applied for TAS status with respect to all surface waters within the Flathead Indian Reservation. The Flathead Indian Reservation in Montana is marked by at least two important characteristics that have shaped this litigation. First, its dominant topical feature is Flathead Lake, a large lake that, with its tributaries, provides water for domestic, industrial, and agricultural uses on the lands within the Reservation boundaries. Second, the land within those boundaries reflects a pattern of mixed ownership and control between tribal and non-tribal entities. These non-tribal entities include the state, the county, and several municipalities that engage in regulated discharges on the Reservation pursuant to existing NPDES permits.
 
 
 20
 In their application for TAS status, the Tribes identified several facilities on fee lands within the Reservation that have the potential to impair water quality and beneficial uses of tribal waters. These include feedlots, dairies, mine tailings, auto wrecking yards and dumps, construction activities and landfills. Other actual or potential point sources include wastewater treatment facilities, commercial fish ponds and hatcheries, slaughterhouses, hydroelectric facilities and wood processing plants.
 
 
 21
 Montana opposed granting the Tribes TAS status to the extent such status would extend to reservation lands and surface waters owned in fee by non-members of the Tribes. The EPA director approved the Tribes' application after determining that the Tribes possessed inherent authority over non-members on fee lands. Montana then filed this action.
 
 
 22
 The Montana Appeal and the Scope of Inherent Authority
 
 
 23
 In general, absent express authorization by federal statute or treaty, Indian tribes lack civil authority over the conduct of non-members on non-Indian land within a reservation. See Montana, 450 U.S. at 564, 101 S.Ct. at 1258. See also Strate v. A-1 Contractors, --- U.S. ----, ----, 117 S.Ct. 1404, 1409, 137 L.Ed.2d 661 (1997) (reaffirming). The Court in Montana noted, however, that in certain circumstances, even where Congress has not expressly authorized it, Indian tribes retain inherent sovereign power to exercise civil jurisdiction over non-Indians on fee lands. See Montana, 450 U.S. at 566, 101 S.Ct. at 1258. The first exception to the general rule relates to non-members who enter consensual relationships with the tribe or its members. See id. at 565, 101 S.Ct. at 1258. The second exception concerns conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 556, 101 S.Ct. at 1258.
 
 
 24
 Although the Supreme Court has applied the Montana rule in subsequent cases, the Court's 1989 fractured decision in Brendale, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343, left some confusion as to what the correct standard should be. Brendale involved the authority of tribes to zone non-Indian fee land. Although the Justices disagreed over how to apply Montana's second exception in that context, a majority of the Justices nonetheless agreed that the Montana rule controlled. Id. Later, in Strate, a unified court reaffirmed the vitality of Montana. In Strate, which was after the district court decision in this case, the Court stressed that there must be a nexus between the regulated activity and tribal self-governance in order for the second Montana exception to apply. See Strate, at ----, 117 S.Ct. at 1416.
 
 
 25
 Montana's position in the district court and in this court has been that EPA got the scope of inherent authority wrong, and that the Tribes should be able to engage in nonconsensual regulation of non-tribal entities only when all state or federal remedies to alleviate threats to the welfare of the tribe have been exhausted and have proved fruitless. Their brief relies heavily upon the opinions of Justices Stevens and White in Brendale to argue that the Brendale decision effectively repudiated the Montana standard. That standard, in appellants' view, had erroneously equated tribal sovereignty with local government police power.
 
 
 26
 We agree with appellants insofar as they contend that the scope of inherent tribal authority is a question of law for which EPA is entitled to no deference. EPA's decision to adopt inherent tribal authority as the standard intended by Congress may well be viewed in a deferential light because the statute's language and legislative history were not entirely clear. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984). EPA's delineation of the scope of that standard, however, has nothing to do with its own expertise or with any need to fill interstitial gaps in the statute committed to its regulation. Therefore, EPA's delineation of the scope of tribal inherent authority is not entitled to deference.
 
 
 27
 We cannot agree with appellants, however, that EPA has committed any material mistakes of law in its delineation of the scope of inherent tribal authority. Rather, the agency took a cautious view by incorporating both Justice White's and Justice Stevens' admonitions in Brendale that, to support the exercise of inherent authority, the potential impact of regulated activities must be serious and substantial. See Final Rule, 56 Fed.Reg. at 64,878; Brendale, 492 U.S. at 431, 109 S.Ct. at 3008 (White, J.); id., 492 U.S. at 447, 109 S.Ct. at 3016 (Stevens, J.). Moreover, in Justices Stevens' and White's opinions, upon which Montana relies, there is no suggestion that inherent authority exists only when no other government can act.
 
 
 28
 Indeed the EPA decision appears to adumbrate the Supreme Court's holding in Strate, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661, that the exercise of tribal jurisdiction over non-tribal members engaged in traffic accident litigation was not necessary to the self-governance of the tribe. We therefore disagree with appellants that Brendale overruled Montana. The Strate decision reaffirms the vitality of Montana; Brendale did not repudiate it.
 
 
 29
 EPA's decision, applying its standards in this case, found that the activities of the non-members posed such serious and substantial threats to Tribal health and welfare that Tribal regulation was essential. We have previously recognized that threats to water rights may invoke inherent tribal authority over non-Indians. "A tribe retains the inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the health and welfare of the tribe. This includes conduct that involves the tribe's water rights." Colville Confederated Tribes v. Walton, 647 F.2d 42, 52 (1981) (internal citations omitted, emphasis added). Colville also supports EPA's generalized finding that due to the mobile nature of pollutants in surface water it would in practice be very difficult to separate the effects of water quality impairment on non-Indian fee land from impairment on the tribal portions of the reservation: "A water system is a unitary resource. The actions of one user have an immediate and direct effect on other users." Id.
 
 
 30
 In contrast, the tribes in Strate reserved no right to exercise control over the federal right-of-way maintained by the state. See Strate, at ----, 117 S.Ct. at 1414. Furthermore, the conduct of users of a small stretch of highway has no potential to affect the health and welfare of a tribe in any way approaching the threat inherent in impairment of the quality of the principal water source.
 
 
 31
 Our decision is also fully consistent with the only other circuit opinion that has yet considered the issue of tribal authority to set water quality standards. City of Albuquerque v. Browner, 97 F.3d 415 (10th Cir.1996). In that case, the tribe had promulgated WQS that were more stringent than federal standards. The city contended that the tribal standards could not be more stringent than federal standards. The court rejected the contention, observing that the authority to establish such standards "is in accord with powers inherent in Indian tribal sovereignty." Id. at 423.
 
 
 32
 Accordingly, we affirm the district court's decision that EPA's regulations pursuant to which the Tribe's TAS authority was granted are valid as reflecting appropriate delineation and application of inherent Tribal regulatory authority over non-consenting non-members.
 
 THE INTERVENORS' APPEAL
 
 33
 The Intervenors consist of the Flathead Joint Board of Control, two irrigation districts, and four individual irrigators who own land in fee situated within the boundaries of the Reservation. None of the proposed intervenors, however, holds an NPDES permit that may potentially be modified due to any change in WQS imposed by the Tribes.
 
 
 34
 To prevail on a motion to intervene as of right, the intervenor must (1) make a timely motion, (2) claim a "significantly protectable" interest in the property that is the subject of the action, (3) demonstrate impairment of its ability to protect that interest, and (4) prove that the interest is inadequately represented by the parties to the action. See Sierra Club v. EPA, 995 F.2d 1478, 1481 (9th Cir.1993).
 
 
 35
 The district court held that because the Intervenors do not hold NPDES permits, the transfer of the right to establish WQS from the state to the Tribes "will have no immediate or any foreseeable, demonstrable effect upon the proposed intervenors." In their briefs to this court, the Intervenors attempt to state a broader interest in the enforcement process by suggesting that the imposition of standards promulgated by the Tribes would violate their civil rights by subjecting them to tribal jurisdiction. They also argue that EPA approval of tribal WQS would depress the value of their property.
 
 
 36
 Because the Intervenors hold no NPDES permits they could not be subject to NPDES enforcement proceedings. Moreover, TAS status does not confer enforcement authority on the Tribes; it only enables the Tribes to set the standards. Even if the Tribes applied for enforcement authority, the NPDES permits would still be issued by EPA and enforced in federal, not tribal, courts. Finally, even assuming that EPA's approval of the tribal WQS program might affect property values, such a speculative and purely economic interest does not create a protectable interest in litigation concerning a statute that regulates environmental, not economic, interests. See Portland Audubon Soc'y v. Hodel, 866 F.2d 302, 309 (9th Cir.1989) (an adverse economic impact does not create a significant protectable interest in litigation under the National Environmental Policy Act); see also Sierra Club, 995 F.2d at 1485-86 (city that holds permit under CWA has a protectable interest in CWA litigation that might affect a city's discharge from permitted operations).
 
 CONCLUSION
 
 37
 The district court correctly entered summary judgment in favor of the defendants on the underlying challenge to the grant of TAS status to the Tribes, and it also correctly denied the Intervenors' application to intervene as of right. Its judgment is AFFIRMED.
 
 
 
 *
 Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 The Administrator is authorized to treat an Indian tribe as a State for purposes of subchapter II ... to the degree necessary to carry out the objectives to this section, but only if --
 (1) the Indian tribe has a governing body carrying out substantial governmental duties and powers;
 (2) the functions to be exercised by the Indian tribe pertain to the management and protection of water resources which are held by an Indian tribe, held by the United States in trust for Indians, held by a member of an Indian tribe if such property interest is subject to a trust restriction on alienation, or otherwise within the borders of an Indian reservation; and
 (3) the Indian tribe is reasonably expected to be capable, in the Administrator's judgment, of carrying out the functions to be exercised in a manner consistent with the terms and purposes of this chapter and of all applicable regulations.