OPINION
DESMOND, Justice:
I. INTRODUCTION AND PROCEDURAL BACKGROUND
The central question before us is whether federal Indian law precludes the Tribal Court of the Confederated Salish and Koo-tenai Tribes from exercising jurisdiction over a tort action involving three students of' the Tribes’ Salish Kootenai College (“SKC”) who were riding in a college vehicle as a part of their regular studies at the college when it crashed. We hold it does not.
On May 12, 1997, as part of their coursework in heavy equipment operation, three SKC students, Appellant James Smith, Shad Burland and James Finley, were traveling in a dump truck owned by the college on U.S. Highway 93, a state highway within the exterior boundaries of the Flathead Indian Reservation. Appellant Smith was driving. Tragically, a single vehicle rollover occurred. Shad Burland was killed and both James Finley and Appellant Smith were injured. Appellant Smith is a member of the Umatilla Tribe. Shad Burland was, and James Finley is, enrolled in the Confederated Salish and Kootenai Tribes (“Tribes”).
On September 1, 1999, Mr. Bmiand’s estate filed a civil complaint in the Tribal Court naming as defendants the Confeder *92 ated Salish and Kootenai Tribes, Salish Kootenai College and Appellant Smith. On December 1, 1999, the complaint was amended and the Tribes were dismissed pursuant to stipulation, having raised the defense of sovereign immunity. On January 31, 2000, SKC cross-claimed against driver Smith. On February 17, 2000, passenger Finley sued SKC and Smith. On February 23, 2000, Smith cross-claimed against SKC. The Finley suit was consolidated with the Burland suit. Following settlement negotiations, the parties stipulated to the dismissal of all parties except Smith and SKC.
Both the Proposed Pretrial Order signed by SKC and Smith and Tribal Trial Judge Winona Tanner’s final Pretrial Order described the issues of fact to be tried regarding liability as follows:
(1) Was Defendant Salish-Kootenai College negligent and, if so, was its negligence a cause of Plaintiffs damages, if any?
(2) Was Plaintiff [Smith] contributorily or comparatively negligent and if so, was his negligence a cause of his damages, if any?
As proposed by Smith and SKC, the final Pretrial Order realigned the remaining designating Appellant Smith as the Plaintiff and SKC as the Defendant.
On September 29, 2000, after a week-long trial, the jury returned a verdict in favor of SKC. On October 13, 2000, the Tribal Trial Court entered its judgment on the verdict. On the same day, Smith filed a motion in the Tribal Trial Court to vacate the verdict for lack of subject matter jurisdiction. While the post-trial motions were pending before the Tribal Trial Court, Smith filed a Notice of Appeal to this Court on October 27, 2000. On November 1, 2000, the Tribal Trial Court announced that it would stay consideration of the pending motions in light of the appeal having been filed. Therefore, it did not rule on the motion to dismiss for lack of subject matter jurisdiction. On December 21, 2000, Appellant Smith filed a motion with this Court challenging the subject matter jurisdiction of the Tribal Court. We remanded the matter back to the tribal court to allow it to rule on the jurisdictional challenge and to establish a factual record on jurisdiction. On April 6, 2001, the Tribal Trial Court ruled that it did possess subject matter jurisdiction over the matter and Appellant Smith renewed his appeal to this Court.
On July 17, 2001, the Tribal Court of Appeals held oral argument on pending motions regarding scheduling, the transcript and Smith’s motion to dismiss for lack of jurisdiction.[2] On October 25, 2001, this Court ordered briefing on the merits to proceed and requested that “if there are additional facts relevant to subject matter jurisdiction that have not been called to the Court’s attention in previous briefings, the Court encourages the parties to identify these facts in the upcoming briefing with appropriate citation to the trial transcript or other records before the trial court.”[3] Upon completion of the transcript, Appellant filed his opening brief on April 15, 2002 and the Appellee filed its response brief on June 13, 2002. Appellant Smith then requested, and this Court approved, an unopposed motion to allow Smith until September 20, 2002 to file his final Reply brief. Because neither *93 party has accepted this Court’s invitation to develop further the factual or legal arguments regarding subject matter jurisdiction, that aspect of the briefing has concluded and this Court is now prepared to rule on its jurisdiction.
II. SUBJECT MATTER JURISDICTION
A. Tribal Law
The Tribal Trial Court correctly ruled that Tribal law authorizes it to exercise jurisdiction over this matter. Title II, § 1-2-104, CSKT Laws Codified, provides in relevant part:

Civil Jurisdiction.

[[Image here]]
(2) To the fullest extent possible, not inconsistent with federal law, the Tribes may exercise their civil, regulatory and adjudicatory powers. To the fullest extent possible, not inconsistent with federal law, the Tribal Court may exercise subject matter and personal jurisdiction. The jurisdiction over all persons of the Tribal Court may extend to and include, but not by way of limitation, the following:
(a) All persons found within the Reservation.
(b) All persons subject to the jurisdiction of the Tribal Court and involved directly or indirectly in:
(i) The transaction of any business within the Reservation;
(ii) The ownership, use or possession of any property, or interest therein, situated within the Reservation;
(iii) The entering into of any type of contract within the Reservation or wherein any aspect of any contract is performed within the Reservation;
(iv)The injury or damage to property of the Tribes or a Tribal member.
(3)As used in this section, “person” means an individual, organization, corporation, governmental subdivision or agency, business trust, estate, trust, partnership, association, joint venture, or any other legal or commercial activity.
Title II. CSKT Laws Codified.
When we apply this provision to this matter, the result is that the Tribal Court may exercise subject matter jurisdiction. Specifically, the SKC is a person within the meaning of § 1-2-104(3); the events leading to the accident and this lawsuit arguably fall within each of § 1-2-104 subsections (2)(b)(i)-(iv).
B. Federal Indian Law
The Tribal Trial Court was also correct in ruling that federal Indian law does not preclude it from exercising jurisdiction. Tribal interests significant under federal Indian law support tribal jurisdiction here. Educating tribal members is an important component of self-government as is the adjudication of disputes arising on the reservation. This case is about what forum will determine whether a tribal college committed a tort or torts in the course of its instructional program.
This is not a case that is “ ‘distinctly non-tribal in nature’ ”. Strate v. A-1 Contractors, 520 U.S. 438, 457, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). Nor is it a “‘run-of-the-mill [highway] accident.”’ Id. Rather, this is a case that arose in a distinctly tribal context, i.e., that of a tribally-established college[4] created to provide advance *94 ment for tribal members through education. The case involves three students in the college, two of whom were tribal members. The third, Appellant Smith, a member of the Umatilla Tribe, testified that he enrolled in the Tribal college, “To better my life” and the life of “my family”. Transcript, Vol 4, at 32. Assertions and allegations as to causation extend far beyond an accident on a state highway to earlier events at the college pertaining to supervision of the students and control and maintenance of the vehicle.
Historically, federal Indian law has evolved to reflect changes in federal policy, congressional directive and judicial decision-making as well as to respond to a more complex world. As a result, tribal authority has been narrowed in scope from its breadth prior to European contact. Worcester v. Georgia, 31 U.S.(6 Pet.) 515, 8 L.Ed. 483 (1832); United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). Oliphant v. Suquamish Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). Yet we must remember to review each narrow situation in light of the unchanging, broad, basic principles of Federal Indian law, which include sustained federal recognition of and support for tribal self-government. Decisional law has been especially deferential to tribal authority when it is found to be necessary to the preservation of tribal self-government. See, e.g., Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). As we discuss below, this case involves an important component of the preservation of tribal self-government, specifically tribally-controlled education.
Another important component of tribal self-government is that placed in the tribal judiciary, the power to resolve disputes arising on the reservation. This power is derived from tribal inherent authority and has long been recognized and supported by the federal government. Fisher v. District Court, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976), Wheeler, infra. For example, the Indian Reorganization Act of 1934, legislation intended to revitalize tribal governments, recognized as an existing power of Indian tribes the power to provide for tribal law and order. Ch. 576, 48 Stat. 984 (codified at 25 U.S.C. §§ 461-479); Powers of Indian Tribes, 55 Inferior Dec. 14 (1934).
Continuing federal support, legislative, executive and judicial, for tribal court jurisdiction and responsibility since the 1960s has encouraged tribes to make significant strengthening changes in their court systems. For example, Congress acted directly in this regard when it enacted “The Indian Child Welfare Act of 1978”, affirming broad tribal court authority over child welfare matters involving Indian children both on and off the reservation. Pub.L. No. 95-608, 92 Stat. 3069 (codified at 25 U.S.C. §§ 1901-1963). Then ⅛ 1986 Congress increased the maximum allowable criminal sentences tribal courts can impose. Pub.L. 99-570, 100 Stat. 3207(codified as amended at 25 U.S.C. § 1302). The executive branch supported tribal justice systems in its policy and leadership. United States Supreme Court decisions have recognized and supported tribal judicial authority. See, e.g., Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); National Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985); Iowa Mutual Insurance Co. v. LaPlante, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10(1987).
However, the Supreme Court has also ruled that in some instances tribal court *95 authority is limited, generally in cases in which a tribal court has exercised jurisdiction over a non-Indian or an Indian who is not a member of the Tribes. See e.g. Oliphant, Strate, infra. Broadly, the Tribal Court has found a limitation on tribal jurisdiction when, in the view of the Court: (1) the exercise of that jurisdiction is inconsistent with the tribe’s limited sovereignty resulting from the incorporation of Indian tribes into the United States and (2) the exercise of that jurisdiction is not necessary to the preservation of tribal self-government. The greater the Indian and tribal interests involved in a case the more likely exercise of judicial authority will be found to be necessary to self-government. Here, the Tribes have significant interests in the education of tribal members as well as in regulation of the manner in which that education is delivered.
1. Defining the Parties: the Status of SKC
The legal status of SKC is relevant for purposes of determining subject matter jurisdiction. Essentially Smith argues that because SKC is not a “member” of the Tribes, ipso facto, it must be treated as a “nonmember.”[5] Smith then concludes that the suit is between two “nonmembers” arising on a State highway, and therefore the holding in Strate, precludes tribal court jurisdiction. We disagree.
To treat SKC as a nonmember for purposes of jurisdiction would be to deny both the fundamental nature and identity of the college and the complexity of federal Indian law. The Tribes created SKC for the education and benefit of their members. The name of the college itself—Salish Koo-tenai College[6]—clearly denotes its specific Tribal nature: it is a college of the Salish and Kootenai people. The Tribes incorporated SKC under Tribal law on November 18, 1977. (McDonald Affidavit, October 29, 1999, 113) SKC was later incorporated under state law in 1978.[7] (Id., II4). While on the surface its methods of incorporation may indicate a dual identity, from its inception SKC has maintained a Tribal character. Its governing Bylaws—which apply regardless of whether SKC is acting under its' tribal or state charter—provide that all members of the Board of Directors must be enrolled members of the Tribes. (SKC Bylaws, Ait. III.) The Tribal Council appoints all members of the Board of Directors. Id. The Tribal Council may only remove a board member for just cause by a two-thirds vote of a legal quorum of the council. Id. When a vacancy occurs on the board, the Tribal Council appoints the successor for the remainder of the term. Id. The Board of Directors is required to report to the Tribal Council on a regular basis and inform Tribal members of pertinent activities of the Board. (SKC Bylaws, Ait II.) The College is to assure job *96 preference in accordance with tribal personnel hiring procedures. Id,
The respected and successful SKC is the pride of the Salish-Kootenai people. The mission of the SKC is to provide qualify postsecondary educational opportunities for Native Americans locally, and from throughout the United States. See, Exhibit A, SKC’s July 12, 2000 Brief in Support of Partial Summary Judgment, at 1. In performing its educational purpose, the SKC seeks to maintain “the cultural integrity of the Salish and Kootenai people.” Id. The college is a major educational institution on the Flathead Reservation, with 38 full-time instructors and 50 part-time instructors. It has. over 850 full-time students and another 300 part-time students. Id. at 2. Most of the students are Indians from the Flathead Reservation. Id.
This Court finds that SKC is a tribal entity closely associated with and controlled by the Tribes. For purposes of determining jurisdiction, it must be treated as a tribal entity.[8] To equate SKC’s status with that of a non-member when significant tribal interests are present would be neither reasonable nor in keeping with federal Indian law.
2. Tribal jurisdiction under Montana v. United States
What is now considered to be the most significant contemporary United States Supreme Court statement of the scope of a tribe’s civil jurisdiction over nonmembers is found in Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). In what at first appeared to be a somewhat narrow view of retained inherent sovereignty, the Court stated, the “exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.” 450 U.S. at 564, 101 S.Ct. 1245. Or, absent a controlling treaty or other federal enactment, the inherent sovereign powers of an Indian tribe; do not extend to the activities of nonmembers of a tribe on non-Tribal land. Id.[9] In this case, the parties have not identified any controlling treaty provision or federal statute that would confer civil jurisdiction over nonmembers such as Smith. The question, then, is whether the Tribal Court has jurisdiction under the Tribes’ inherent authority.
In Montana, the United Stated Supreme Court reviewed the Ninth Circuit’s decision, United States v. Montana, 604 F.2d 1162 (1979), which had upheld the right of the Crow Tribe to regulate all hunting and fishing within the Crow reservation. The Ninth Circuit's decision was based partly on its conclusion that Crow authority over Indians and non-Indians on both Indian and non-Indian land was an incident of the tribe’s inherent sovereignty over the entire Crow reservation. 604 F.2d at 1170. The Supreme Court did not disturb the Ninth Circuit’s holding that the *97 Crow Tribe could prohibit hunting and fishing on Indian lands or condition entry by charging fees and imposing regulations. But after examining relevant treaties and federal legislation, the Supreme Court concluded that the reach of inherent tribal authority over activities conducted by non-Indians on fee land was limited.
The Montana Court then delineated two now well-known “exceptions” to its general rule:
To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements, [citations omitted] A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.
450 U.S. at 565-566, 101 S.Ct. 1245.
Our examination of Montana’s “first exception” results in a determination that Appellant Smith has a “consensual relation” with the Tribes within the meaning of that exception. Smith chose to enroll in the college for the purpose of being educated and trained to be a heavy equipment operator and to obtain his commercial driver’s license (“CDL”). Thus he voluntarily engaged in a consensual relationship with the SKC, a tribal entity within the exterior boundaries of the Flathead Reservation. Appellant Smith acknowledges that he, “was driving the track as part of his educational requirements as a student at Salish-Kootenai College.” Smith Complaint, ¶ 5. All three occupants of the dump truck were enrolled at SKC and studying to become heavy equipment operators. Pretrial Order, II 1. As part of Appellant Smith’s requirements to graduate, he had to obtain a CDL and become knowledgeable in operating heavy equipment such as the dump truck that was involved in the accident. Transcript, Vol. 4, at 33-34. The requirements for the CDL involved both course work and operation of heavy equipment. The course work, included classes, conducted on the SKC campus, such as truck driving law's and regulations, heavy machinery operation, and safety instruction. Transcript, Vol. 4, 65.
Further, the record establishes a direct nexus between the voluntary, consensual relationship between Smith and SKC and the civil complaint filed by Smith. His allegations against the college are a direct outcome of the relationship of student-college that he chose to establish.
Since we find that the Tribal Court has jurisdiction over this matter under Montana’s first exception, we need go no further. However, because the parties have argued that Strate controls, we will discuss that case below. Before turning to Strate, we will address why this case also fits within the second Montana exception. The Tribal endeavor encompassed in SKC is essential to tribal self-government and internal relations thus impacting “the political integrity” of the Tribes within the meaning of Montana. In establishing SKC the Tribes were both implementing and sustaining their self-governing powers. As outlined above, the more significant a particular interest is to a tribe the more likely regulation of that interest will be essential : to tribal self-government. The competing forum here, the State of Montana, does not appear to have a significant *98 interest in how a tribal college conducts its affairs.
The Tribal Council has decided the availability of higher education to tribal members is important enough to that governing body that it has supported and strengthened SKC for over 25 years. What better measure of the significance of this Tribal activity to the. Tribe and its political integrity can there be?
The federal government, 100, has underscored the significance of tribal colleges. One year after the Tribes established SKC, the United States Congress recognized the value of the Tribes’ educational policy when it enacted, “The Tribally Controlled Community College Assistance Act of 1978”, P.L.95—471, 25 U.S.C. 1801 et seq. Congress stated that its purpose was, “to provide grants for the operation and improvement of tribally controlled community colleges to insure continued and expanded educational opportunities for Indian students.” § 25 U.S.C. 1802.
It is difficult to argue that an educated citizenry is not essential to self-government, whether of a tribe or of another government. Therefore, we conclude that jurisdiction in this case can be sustained under the second Montana exception.
3. Tribal jurisdiction under Strate v. A-l Contractors
Smith argues that the Tribes lack jurisdiction in this case under the Supreme Court’s holding in Strate. Strate is not controlling. In Strate, a vehicle owned by a non-Indian collided with another vehicle driven by a non-Indian and owned by non-Indian entities on a state highway running through the Fort Berthold Reservation. The injured non-Indian sued the non-Indian driver and owner of the other vehicle in tribal court. In its opinion, applying Montana> the Supreme Court equated the state highway to non-Indian fee lands. It noted (quoting the lower court) that the dispute “arose between two non-Indians involved in a[a] run-of-the-mill [highway] accident.” 520 U.S. at 457, 117 S.Ct. 1404. The Court also found that the dispute was “distinctly non-tribal in nature.” Id.
Here, as pointed out above, Appellant Smith’s allegations of fault extend far beyond the accident itself. For example, he asserts there were not adequate seat belts for all three passengers in the dump truck and that the track encountered mechanical failure causing the accident. The Smith complaint alleges numerous negligence claims against SKC arising from the alleged duty on behalf of SKC “to provide a safe and reasonable educational environment,” including (1) a duty to regularly inspect the heavy equipment and vehicles; (2) a duty to proride a vehicle that was safe and a driver With adequate knowledge and experience to handle the dump truck, and (3) a duty to adequately inspect, maintain, or repah* the dump truck. Complaint, ¶¶ 3, 5, 6. Further, in the pretrial order, Smith stated he intended to prove at trial that Smith’s lack of experience in driving the dump truck was “due to improper or inadequate training,” lack of and/or improper supervision of Smith, improper tires, a defective/cracked leaf spring and lack of and/or improper maintenance of the dump truck. Pretrial Order, at 3. Extensive evidence and witness testimony was offered at trial regarding the SKC’s alleged breach of duty to provide a safe environment, Thus Strate is distinguishable from this case.
III. CONCLUSION
In conclusion, the Tribal Trial Court was correct In its determination that it properly exercised jurisdiction over this matter.
The parties have ably briefed the merits of the appeal. The merits were not ad *99 dressed at oral argument. Unless either party requests oral argument within 20 days, we will proceed to rule on the merits of the appeal.

. At the time of the oral argument a complete transcript of the trial was not available. Both parties supported staying the requirement of ordering the complete transcript until the ruling on jurisdiction.

. This would allow for the full transcripts to be prepared regarding any jurisdictional factual issues.

. We take judicial notice that the SKC campus is located on tribal land in Pablo, die *94 tribal center of government.

. See, e.g., Smith December 21, 2000 Memorandum in Support of Motion to Dismiss at 10, (“Because SKC is not and could never be a tribal member, the subject matter jurisdiction requirements of Strate are not met."); Smith January 12, 2001 Reply Brief at 8, (“Pursuant to Strate the absence of tribal membership is dispositive of Smith's motion").

. The Salish Kootenai Community College, Inc. does business as the Salish Kootenai College. (McDonald affidavit, October 29, 1999, 1 12)

.The record does not include art explanation for incorporating under both tribal and state law. The fact that the functioning bylaws for the College continue to be the Bylaws adopted at the time that the college was originally tribal I y-chartered, and the fact that the bylaws continue to vest ultimate control over the selection and removal of the Board of Directors with the Tribal Council are solid indications that the College is functioning primarily under its tribal charter, though possibly not exclusively.

. Our holding is consistent with the Montana Federal District Court's characterization of SKC in Bartell v. American Home Assurance Company, i.e., that the “Salish-Kootenai College is incorporated as a Tribal non-profit corporation located within the Flathead Reservation.” August 10,2001, Slip Op at 10. In certifying a state law question arising out of the Bartell case to the Montana Supreme Court, the federal court stated "this court has determined that the Salish Kootenai College, Inc, is a governmental agency....” See, also Bartell v. American Home Assurance Company, 310 Mont. 276, 49 P.3d 623 (2002).

. Nevada v. Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), indicates that the Montana rule applies even on Tribal land. Our result would be the same because it is based on this case fitting within both Montana exceptions.