*307
UNCONTESTED FACTS AND ORDER

ANITA FINEDAY, Judge.

STATEMENT OF FACTS AS TO WHICH NO DISPUTE EXISTS

A. PARTIES
1. Gaming World International, Ltd. (GWI) at all times relevant herein was a corporation organized under the laws of the State of Delaware, on June 25, 1991, as a closely held entity, owned entirely by Angelo Medure. Angelo Medure is an individual resident of Pennsylvania. Me-dure Arbit. Tr. p. 694, WE Ex. 40.
2. White Earth Reservation Business Committee (WERBC) is a federally recognized Indian Tribe which operates the Shooting Star Casino (SSC) pursuant to the provisions of the 1988 Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et seq. WE Ex. 9, 3-6-92 Management Agreement.
3. Intervenor Plaintiff Raymond Augi-naush is a resident and a member of the White Earth Band of Chippewa and represents all tribal members similarly situated.
4. The Bureau of Indian Affairs (BIA) is the party whose consent was required for a valid gaming management contract. By law, a casino management agreement is required to have the approval of the National Indian Gaming Commission (NIGC), whose designee through February 23, 1993, was Earl Barlow, Area Director, Bureau of Indian Affairs (BIA). Without the appropriate approval, a management contract is null and void. 25 C.F.R. § 533.7. WE Ex. 41.
5. WERBC obtained financing for the construction of the SSC from the White Earth Land Settlement Act (WELSA), 25 U.S.C. § 331, economic development fund, as well as commercial financing from the First National Bank Aitkin, Aitkin, Minnesota. Before the WELSA monies could be used, WERBC, by law, was required to have an approved financial ordinance and investment plan in place for the safeguarding of the WELSA funds. P.L. 99-264, § 12, 25 U.S.C. § 331 March 24, 1986.
B. JULY mi LETTER OF INTENT
6. Angelo Medure became involved in Indian gaming in May or June of 1991, through contact with his personal attorney, Lou Pomerico. Medure Arbit. Tr. p. 629-632.
7. GWI was incorporated on June 25, 1991. Between June 25, 1991, and July 3, 1991, Angelo Medure purchased a trip for Darrell “Chip” Wadena, Chairman of the WERBC, and his wife and family to visit Florida and Disney World to make a favorable impression on them. Medure Arbit. Tr. p. 694.
8. After the Florida trip, Angelo Me-dure directed his attorney to draw up a letter of intent which was dated July 3, 1991. Medure Arbit. Tr. p. 695, WE Ex. 1.
9. On July 12, 1991, Angelo Medure, President, GWI, signed a letter of intent with Darrell Wadena, Chairperson, *308 WERBC, for the exclusive right to improve, develop, manage, maintain and operate all tribal gaming activities at the Shooting Star Casino. Medure Arbit. Tr. p. 701, WE Ex. 2.
10. On July 12, 1991, Angelo Medure was aware that any agreement to operate, improve, develop, and manage a gaming facility required the approval of the NIGC and/or the BIA, and without such approval an agreement was null and void. Medure Arbit. Tr. p. 701, WE Ex. 3, p. 21, 26.
11. After July 12, 1991, GWI had a contractual obligation to provide certain services to the WERBC. Medure Arbit. Tr. p. 701.
12. The letter of intent (WE Ex. 2) signed by GWI and WERBC gave GWI a right to obtain 40% of the net profits in exchange for an exclusive right to “improve, develop, manage, maintain and operate all tribal gaming activities at the Shooting Star Casino.” All undertakings of GWI and Angelo Medure or his agents after July 12, 1991, were to fulfill their obligation and commitment “improve, develop, manage, maintain and operate all tribal gaming activities on the Shooting Star Casino.” Medure Arbit. Tr. p. 703.
C. JULY 31, 1991 MANAGEMENT CONTRACT-UNAPPROVED
13. On July 31, 1991, a management contract was signed by GWI and WERBC. The contract sought to flesh out the letter of intent of July 12, 1991. Medure Arbit. Tr. p. 706, WE Ex. 3.
14. The July 31,1991 contract required GWI to “operate, improve, develop, manage and maintain the property known as Shooting Star Casino.” Medure Arbit. Tr. p. 706, WE Ex. 3, p. 2.
15. The July 31,1991 contract required GWI to be responsible for all business affairs in connection with the pre-development, financing, improvement, development, management and maintenance of the enterprise. WE Ex. 3, p. 6.
16. In July of 1991, Angelo Medure had no idea what the finances were for the WERBC, and assumed that WERBC had sufficient assets to construct the facility, which the July 31, 1991 agreement contemplated. Medure Arbit. Tr. p. 708.
17. The July 31, 1991 agreement contemplated the WERBC to construct, at its own cost, the casino facility, and GWI would put in all of the gaming equipment necessary for operating the business. Me-dure Arbit. Tr. p. 709.
18. The July 31, 1991 contract obligated GWI to provide the following:
(a) personnel to conduct a program of instruction for applicants; Medure Arbit. Tr. p. 718, WE Ex. 3, p. 5;
(b) be responsible for hiring and firing decisions at the casino; Medure Ar-bit. Tr. p. 720, WE Ex. 3, p. 6;
(c) be responsible for security personnel which would include surveillance; Medure Arbit. Tr. p. 722, WE Ex. 3, p. 6;
(d) be responsible for pre-development and development expenses and financing of the expenses; Medure Arbit. Tr. p. 725, WE Ex. 3, p. 6;
19. Although GWI was responsible for managing the facility, Angelo Medure testified that GWI had no employees at the casino at any time of the relationship. Medure Arbit. Tr. pp. 712, 715-716.
20. In exchange for all of the obligations undertaken by GWI, GWI was to receive 40% of the net profits after deducting development costs, which, in the 1991 agreement, excluded the cost of construction of the facility which was to be paid for by WERBC. Medure Arbit. Tr. p. 737, WE Ex. 3.
*309 21. Under the terms of the July 1991 contract (WE Ex. 3), GWI was responsible for obtaining financing for the improvement, development and management of the casino. Cook Arbit. Tr. pp. 418, 419, 422, WE Ex. 3, p. 6.
22. As required by law, the July 31, 1991 contract was sent to Earl Barlow, BIA Area Office, Minneapolis, Minnesota, for approval. WE Ex. 3.
23. The WERBC used WELSA funds to finance construction of the casino making the first withdrawal on May 21, 1991, in a sum of $4 million. Johnson Arbit. Tr. p. 1138, WE Ex. 11, p. 16.
24. In August 1991, Erma Vizenor met with Earl Barlow, Area Director of the BIA, to inquire about the WELSA funds and how those funds would be protected. The meeting lasted into the late evening, after which Earl Barlow assured the representatives from White Earth that he would see to it that the WELSA funds were protected as a separate economic development fund. In order to solidify the understanding, Earl Barlow smoked a peace pipe with the tribal representatives creating a spiritual covenant to protect the WELSA money for future generations. Vizenor Arbit. Tr. pp. 1324-1327.
25. In response to the proposed contract for the management of the SSC, the BIA transmitted the proposed contract to the Office of the Solicitor, United States Department of Interior, for review and comment. On August 30, 1991, the Office of Solicitor, Marsha M. Kimball, responded with a 20-page analysis of the proposed management contract. Cook Arbit. Tr. p. 440, WE Ex. 46.
26. The July 31, 1991 contract was never approved. WE Ex. 9, 41.
D. NOVEMBER /, 1991 REVISED MANAGEMENT AGREEMENT
27. In response to the comments raised by Marsha Kimball, GWI and WERBC submitted a revised contract dated November 1, 1991. Medure Arbit. Tr. p. 743, WE Ex. 5.
28. GWI did not believe there were any significant differences in the terms between the July 31, 1991 contract and the November 1, 1991 contract. Medure Ar-bit. Tr. pp. 746, 747.
29. The November 1, 1991 contract recognized it was not valid until approved by NIGC or the Secretary of Interior. Medure Arbit. Tr. p. 748, WE Ex. 5, p. 21, 17.
30. The November 1, 1991 redrafted agreement obligated GWI to provide personnel to conduct a program of training, personnel to supervise and instruct job applicants, and continued the obligation of the manager to make all hiring and firing decisions. Medure Arbit. Tr. pp. 749-751, WE Ex. 5.
31. The November 1, 1991 contract indicated that all prior agreements, except the July 31, 1991 contract, were null and void. Medure Arbit. Tr. p. 757.
32. The November 1, 1991 contract required that all future expansions and building costs would be considered operational costs of the enterprise. The future expansion which was facilitated by the Miller-Schroeder $10 million note was a future building and would be considered an operating expense even under the November 1, 1991 contract. Medure Arbit. Tr. pp. 759, 760, WE Ex. 5 p. 14.
33. The November 1,1991 contract was never approved by NIGC or MA. Cook Arbit. Tr. p. 451.
E. TEMPORARY CASINO OPERATION
34. The temporary SSC was opened on November 22, 1991. Johnson Arbit. Tr. p. 1055; WE Ex. 49A.
*310 35. Medure was under the impression the temporary casino could be operated without an approved contract for a period of ninety (90) days. Medure Arbit. Tr. p. 646.
36. Medure presented, through his attorney and accountant, justification to convince the BIA to permit a 60/40 split contract instead of the 70/30 split, and allow for a 7 year contract instead of a 5 year contract, which were the upper limits allowed by law. 25 U.S.C. § 2711. Medure Arbit. Tr. p. 764, WE Ex. 6.
37. GWI attempted to convince BIA to approve the 60/40 split primarily because the BIA had approved a similar contract with Grand Casinos for management of the Mille Lacs facility. Medure Arbit. Tr. p. 766.
38. In a further effort to satisfy concerns raised by the BIA and the Office of Solicitor, GWI and WERBC submitted amendments to the management contract on February 11,1992. Medure Arbit. Tr. p. 768, WE Ex. 7.
39. In February 1992, when negotiating an amendment to the unapproved November 1, 1991 management contract, Me-dure had no idea what the tribal finances were or what WELSA referred to. Me-dure Arbit. Tr. p. 770.
40. Medure insists that in an effort to get the casino up and running, GWI finally relented to buying furniture and furnishings and the phone system. Medure Ar-bit. Tr. p. 772). The phone system, however, was leased from AT & T by WERBC. WE Ex. 70.
41. In order to obtain approval of the proposed 60/40 contract, GWI faxed to the Minnesota Chippewa Tribe a justification for the 40% distribution and a 7-year contract, which included such risks as providing housing, transportation, and living expenses for key employees; requiring engineering feasibility studies and marketing analysis to be completed; training school expenses and salaries; guaranteed employment contracts; furnishing the hotel at their own cost; all of the above expenses were argued to be expenses that would be incurred by GWI as their risk. Johnson Arbit. Tr. pp. 1108-1110, WE Ex. 52.
42. Further justification was submitted by WERBC and GWI on January 13,1992, which affirmatively alleged that GWI was required to make initial payments to the lender of up to 50% of the total costs and that Medure personally guaranteed notes and leases and that GWI would be risking up to $5 million in venture capital. WE Ex. 53. In the end, the only cash input by GWI was $41,881.00. Johnson Arbit. Tr. pp. 1045-1046.
F. FEBRUARY 23, 1992 MANAGEMENT CONTRACT
43. On February 23, 1992, GWI and WERBC entered into another management agreement. Medure Arbit. Tr. p. 772, WE Ex. 8.
44. The amended contract dated February 23, 1992, was another attempt to obtain BIA’s approval. Medure Arbit. Tr. p. 775.
45. The February 23, 1992 contract provided as follows:
(a) GWI would provide management personnel, training personnel, supervisory instruction personnel, and have complete control over employment decisions; Medure Arbit. Tr. p. 777, WE Ex. 8;
(b) GWI had complete control over hiring and firing decisions to satisfy concerns raised by BIA; Medure Arbit. Tr. p.778;
(c) GWI provided financing for the operation; Medure Arbit. Tr. p. 778;
*311 (d) Obligated the Tribe at its own expense to provide for the construction of the casino; Medure Arbit. Tr. p. 779, WE Ex. 8, p. 15;
(e) Awarded to GWI 40% of the profits; WE Ex. 8, pp. 13-14;
(f) Continued the validity of the November 1, 1991 and July 31, 1991 agreements. Medure Arbit. Tr. p. 778.
46. GWI insisted that the July 31, 1991 and November 1, 1991 contracts be deemed valid so that GWI would have a right to legally claim the distributions it received under the unapproved contracts. Without that provision, GWI would have no cause of action against the WERBC for services rendered under a null and void contract. Medure Arbit. Tr. p. 780, WE Ex. 8, p. 17.
47. On February 27, 1992, Earl Barlow forwarded to GWI and WERBC a list of comments and recommended changes to the February 23, 1992 management agreement. There were 24 separate comments and findings with an analysis of SSC projections using various cash flow scenarios. Johnson Arbit. Tr. pp. 1096-1101, WE Ex. 50.
48. WERBC and GWI had agreed with BIA on all but 3 of the 24 changes addressed in the February 27, 1991 memo. The changes agreed upon included payment of GWI employees out of GWI profit distributions. WE Ex. 44, p. 2.
G. FINAL NEGOTIATIONS FOR MANAGEMENT CONTRACT
49. Final negotiations between the BIA, GWI and WERBC took place on March 5 and 6, 1992, in Minneapolis, Minnesota. Medure Arbit. Tr. p. 781
50. The resulting agreement dated March 6, 1992, is the only contract to have received even colorable approval by the BIA. Medure Arbit. Tr. p. 781, WE Ex. 9.
51. On March 4, 1992, just two days before the March 6, 1992 contract was signed, Earl Barlow, Area Director, BIA, received a memorandum which provided guidance on minimum criteria to be used for considering anything more than a 70/30 split. The minimum criteria required (1) the management company to assume the majority of the risk; (2) the principal and interest on construction costs would be considered operating expenses; and (3) the term of the agreement would be equal to the term of the construction loans. Johnson Arbit. Tr. p. 1105, WE Ex. 51. The BIA had concluded that GWI did not assume a majority of the risk and recommended the proposed contract be rejected. WE Ex. 50; WE Ex. 1.
52. The original agreement in July of 1991, and amended agreement of November 1, 1991, were amended to include the cabaret expenses as operating expenses at the request of Marsha Kimball, Solicitor for the BIA. Cook Arbit. Tr. p. 410.
53. The July 1991 and November 1991 contracts allowed GWI employees to be compensated as an operating expense, and this provision did not find its way into the March 6, 1992 contract because of objections raised by Marsha Kimball. Cook Arbit. Tr. pp. 412-414.
54. The contract provides GWI the exclusive right to hire and fire employees and provide security personnel. Medure Arbit. Tr. pp. 721, 722.
55. During final negotiations of the March 6,1992 contract, Earl Barlow insisted on three changes to the contract, i.e. reducing the percentage split from 60/40 to 70/30; reducing the length of the contract from 7 years to 5 years, and a requirement that principal and interest payments of both the WELSA note and the Aitkin Bank note be taken out of operating expenses. Medure Arbit. Tr. pp. 655-656.
*312 56. During negotiations of the March 6, 1992 contract, the provisions mandating repayment of the Aitkin Bank loan, $5.5 million, and the WELSA loan, $11.8 million, were required by Earl Barlow. WE Ex. 82, Depo. of David Richards 4-13-99, pp. 15-24.
57. As part of the negotiation, David Richards discussed with Medure the impact repayment of WELSA out of operation expenses would have had on profit distributions to GWI. WE Ex. 82, Depo. of David Richards 4-13-99, pp. 47-48.
58. The negotiations between the Band, GWI and MA came down to Earl Barlow giving an ultimatum on the contract. There was no negotiation. It was Barlow’s way or the highway. (WE Ex. 83, Depo. of Lou Pomerico 4-13-99).
59. In Pomerico’s mind, it was “gestapo tactics” to cram down the provisions of the March 6, 1992 contract. WE Ex. 83, Depo. of Lou Pomerico 4-13-99, p. 58.
60. When Earl Barlow approved the March 6, 1992 contract, Earl Barlow was told that all of the GWI employees would be paid out of the GWI 30% distribution. Medure Arbit. Tr. pp. 881-884; WE Ex. 44.
H. GUARANTEED LOAN APPLICATION
61. GWI was aware WERBC was seeking a guaranteed loan approval through the BIA to aid in the construction of the SSC, and were required to meet certain federal criteria. WE Ex. 5, p. 2.
62. To advance the guaranteed loan application, GWI and WERBC made certain representations in their application for loan approval. Johnson Arbit. Tr. p. 1085; WE Ex. 49.
63. The loan application makes affirmative representations as follows:
(a) That WELSA funds in the anticipated amount of $11,700,000.00 would be utilized for the construction; WE Ex. 49A, p. 1;
(b) That GWI would provide furnishings, gaming equipment, and working capital and GWI would be responsible for those expenses from its 40% of the net profits; Johnson Ar-bit. Tr. p. 1085; WE Ex. 49A, p. 3;
(c) That principal and interest payments on WELSA and the Aitkin Bank note $5,500,000.00—were to be classified as an operating expense. Johnson Arbit. Tr. p. 1090-1091; WE Ex. 49B.
64. The guaranteed loan application was put together after the March 6, 1992 management agreement was negotiated. Johnson Arbit. Tr. pp. 1086-1087.
65. The guaranteed loan was approved on March 23, 1992, by the BIA. Indictment, WE Ex. 43, 9.
66. As of April 6, 1992, both the WERBC and GWI believed the WELSA note and the Aitkin Bank note were to be taken as operating expenses over the life of the contract. Johnson Arbit. Tr. p. 1091.
67. The construction loan of $5.5 million from the First National Bank of Aitkin was contingent upon having an approved contract to manage the SSC with the BIA and approval of the subordination of the WELSA debt. Johnson Arbit. Tr. p. 1092, WE Ex. 49C.
68. During the March 5 and 6 negotiations, the BIA required the payment of WELSA P & I and commercial P & I off the top, as an operating expense, before distribution of net profit. Johnson Arbit. Tr. p. 1104; WE Ex. 50, bate stamp # 335.

*313
I.MARCH 6, 1992 MANAGEMENT AGREEMENT

68. The March 6, 1992 contract provided as follows:
(a) That all prior agreements, specifically the July 31, 1991 (WE Ex. 3), November 1, 1991 (WE Ex. 5), and February 23, 1992 (WE Ex. 8) agreements, are rescinded and void and unenforceable; Medure Arbit. Tr. p. 784, WE Ex. 9, p. 1;
(b) GWI was to provide services to improve, develop, manage, and maintain the property known as Shooting Star, which is the same obligation they undertook in July of 1991; Me-dure Arbit. Tr. p. 785, WE Ex. 9, 2.A;
(c) GWI was responsible for all gaming and related activities, materials, equipment, furnishings, fixtures, for gaming and related activities, tools, maintenance and other support items necessary to operate the casino; Me-dure Arbit. Tr. p. 789, WE Ex. 9, 3.A;
(d) GWI was to select employees for management positions, including three appointed by the Band and to provide training aid and personnel to conduct programs of instruction. Medure Arbit. Tr. p. 790; WE Ex. 9, & 3.B.(i);
(e) GWI was to be responsible for all hiring and firing decisions, which provision was required by Earl Barlow but never abided by GWI. Me-dure Arbit. Tr. p. 791; WE Ex. 9, 3C;
(f) GWI was charged with the responsibility of all business affairs, including the development, financing, improvement and management and maintenance of the enterprise. Medure Ar-bit. Tr. p. 798; WE Ex. 9, & 3.E,(i).
70. GWI and WERBC ignored the provisions of the March 6, 1992 contract. All employees who worked on site were SSC employees. GWI had no employees on the SSC properties. Even though the March 6,1992 contract provided that the manager shall employ personnel, GWI did not do so. Medure Arbit. Tr. p. 795.
71. In spite of the contract provision indicating that GWI was to be managing the casino, Medure indicates that from day one he was subject to the control of the WERBC, Gaming Commission, his boss. Medure Arbit. Tr. p. 762.
72. Medure indicates he had to guarantee five years salary to all employees he recruited. He had no written agreement with any of the employees with the exception of Bob Colaluca and that contract did not contain any guarantee. Medure Arbit. Tr. pp. 796-797; WE Ex. 27, 28.
73. Medure and GWI created a color brochure identifying the management team of GWI as including a number of individuals who were on the payroll of the SSC. WE Ex. 15. The 4-color brochure was put together to entice people to invest in his initial public offering. Medure Ar-bit. Tr. pp. 800-801; WE Ex. 42.
74. The 4-color brochure was created by Barb Leuben, who at the time was Marketing Director for SSC. Barb Leuben obtained all of the information from Me-dure and/or Ed Donafrio. Leuben Arbit. Tr. pp. 100-104. All of the individuals identified in WE Exhibit 42 are identified as being on the GWI Management Team. Leuben Arbit. Tr. pp. 116-120.
75. Barb Leuben lives with Medure, and was in an intimate relationship with Medure when WE Exhibit 42 was created. Leuben Arbit. Tr. pp. 89, 102.
76. Ron Cook assisted Medure in setting up the management structure for the SSC, including recruitment of employees, *314 ordering equipment, developing casino manuals, developing an employee handbook and a procedure and practice manual. 0Cook Arbit. Tr. pp. 168-159)
77. Ron Cook developed an organizational chart to describe the structure of GWI, SSC which included all SSC department heads, Ron Cook, under the direction of Medure, created an organizational chart of GWI identifying himself as the Vice President. (WE Ex. 22, WE Ex. 15, Cook Arbit. Tr. pp. 586-547)
78. The only nonreimbursed cash investment made by GWI into the SSC was the cost of remodeling bathrooms in the temporary facility in a sum of $41,881.00. (Cook Arbit. Tr. pp. 156; Johnson Arbit. Tr. pp, 1045-1046)
79. Ron Cook became a full-time SSC employee in December 1991, and has never held any position (director, officer or employee) with GWI. (Cook Arbit. Tr. pp. 136,160)
80. The heavy recruitment period for the casino was prior to March of 1992. (Cook Arbit. Tr. pp. 170,178)
81. Ron Cook became General Manager of the SSC approximately in June of 1992. (WE Ex. 28) As General Manager, he was directly responsible for twelve department heads, who comprised the management team. (Cook Arbit. Tr. pp. 188, 202, WE Ex. 15)
82. Ron Cook was never employed by GWI, but throughout the course of the arbitration was representing Medure in telling the story of GWI. (Cook Arbit. Tr. p. 368)
83. Even though Ron Cook was General Manager of the casino, he had not seen the March 6, 1992 contract and his testimony should be limited to testifying from memory as to how the Management Agreement was implemented, not an attempt to identify what the agreement provided. (Cook Arbit. Tr. p. 416)
84. Although Ron Cook indicates he became a full-time employee of the SSC on December 26,1991, he did represent under oath to the Minnesota Department of Public Safety, Gambling Enforcement Division, that he became employed at the SSC on July 30, 1991. (Cook Arbit. Tr. pp. 369-370, GWI Ex. 15)
85. GWI had no employees at the SSC. Even Medure was an employee of the SSC, and all of the employees at the SSC answered to the WERBC. (Cook Arbit. Tr. pp. 372-376)
86. Bob Colaluca was the only key employee recruited by Medure who had an employment contract. He was relieved of his management duties at the SSC for cause in June 1992. Cook Arbit. Tr. p. 381; WE Ex. 27; 28.
87. Ron Cook was Manager of SSC and understood that GWI had a contractual obligation to provide services to WERBC. Cook Arbit. Tr. p. 383. Ron Cook became aware of the agreement between WERBC and GWI that all employees would be SSC employees after March 6,1992. Cook Arbit. Tr. P. 392.
88. The March 6, 1992 contract approved by Earl Barlow, BIA, obligates the manager to operate, improve, develop and manage the casino. Under Ron Cook’s interpretation, SSC and GWI were one and the same. Cook Arbit. Tr. pp. 466-470.
89. Even though the March 6, 1992 contract required the manager to have full responsibility for hiring and firing employees, this provision was never carried out and no amendment of the agreement was obtained. The March 6, 1992 contract required GWI to have complete control of the gaming and related activities, including the cabaret. Cook Arbit. Tr. pp. 478-479.
*315 90. The March 6, 1992 contract specifically required the payment of the Aitkin Bank note ($5.5 million), and the WELSA note ($11.8 million), to be paid off the top as an operating expense over a 60-month time period. Cook Arbit. Tr. p. 483, WE Ex. 9, 5B.
91. GWI put its name on slot leases to bypass BIA’s approval requirements. WE Ex. 83; Depo. of Lou Pomerieo 4-13-99, p. 101.
92. GWI, although it had no employees on site, brought to SSC management abilities and guarantees of loans. WE Ex. 83; Depo. of Lou Pomerieo 4-13-99, pp. 107, 109.
93. The March 6, 1992 contract provides for the payment of principal and interest of the Aitkin bank note and the WELSA note out of operating expenses. Medure did not believe that was his agreement with WERBC on March 6, 1992. Medure Arbit. Tr. pp. 805-811. No principal or interest payments were made on the WELSA note during the relationship of GWI and WERBC. Jolmsmi Arbit. Tr. p. 1135.
94. Medure indicates that GWI signed for all of the slot machine leases. GWI did not produce any support for this contention, however. Medure Arbit. Tr. p. 818.
J. APPEAL OF 3-6-92 MANAGEMENT CONTRACT
95. GWI knew that the contract of March 6, 1992 would be appealed to the IBIA at the time of the negotiation. WE Ex. 82; Depo. of David Richards 4-13-99, p. 38.
96. The WERBC appealed the decision of Earl Barlow to approve the March 6, 1992 contract. The basis of the appeal was the reduction of the contract term from 7 years to 5 years, the reduction of net profit distribution from 60/40 to 70/30, and the requirement that principal and interest of construction loans (WELSA and Aitkin Bank note), be taken as an operating expense before profit distributions. Medure Arbit. Tr. pp. 823-827, WE Ex. 44.
97. The Notice of Appeal dated March 13, 1992, provides conclusive evidence of the intent of the BIA as to the meaning of the March 6, 1992 contract. The Notice of Appeal provides the following:
(a) Representatives of the Tribe and Manager [GWI] met with Earl Barlow, to discuss 24 further recommended changes. The Tribe and Manager agreed to incorporate all of those 24 recommendations except for three; WE Ex. 44, p. 2;
(b) The Tribe and GWI resisted the changes requested by BIA and were told it is “take it or leave it” proposition; WE Ex. 44, p. 2
98. The contested terms of the March 6,1992 contract were:
(a) the requirement to capitalize and pay out of operating expenses before distribution the $5.5 million Aitkin Bank note, and the $11.8 million WELSA note.
(b) reduction in term from 7 years to 5 years;
(e) reduction in profit distribution from 60/40% to 70/30. WE Ex. 44, pp. 2-4.
99. Prior to March 6, 1992, Medure, through GWI, invested its cash ($41,-881.00) knowing that the contract was not approved and unenforceable unless approved. Medure Arbit. Tr. p. 836.
100. Medure does not know if the casino was operated pursuant to the March 6, 1992 contract. Medure Arbit. Tr. p. 839. Ron Cook denied having knowledge of the March 6,1992 contract and did not know if *316 the casino was operated in accordance with the contract. Cook Arbit. Tr. p. 416.
101. The decision to approve the March 6, 1992 contract was appealed by the WERBC with the advice and consent of GWI. WE Ex. 44.
102. The IBIA ruled that the Area Director had insufficient evidentiary support to require a provision in the contract to repay $17.3 million in construction costs as operating expenses. White Earth v. Minneapolis Area Director, 23 IBIA 216, 226 (1993). GWI Ex. 46.
103. The IBIA affirmed in part and vacated and remanded to the Area Director for further consideration the issue of repayment of construction costs out of operating expenses. White Earth v. Minneapolis Area Director, 23 IBIA 216 (1993).
104. GWI claims that the IBIA ruling was an amendment to the March 6, 1992 contract, but concedes that if it was an amendment, such amendment was never approved by the BIA or NIGC. Cook Ar-bit. Tr. p. 573.
105. Earl Barlow declined to act on the remand because the NIGC had jurisdiction. GWI Ex. 48.
106. Earl Barlow refused to approve the plan to delay the repayment of WEL-SA until the issue of repayment of WEL-SA under the management contract was resolved by the NIGC. WE Ex. 57. Earl Barlow notified the White Earth Band of Chippewa Indians that following remand by the IBIA, the Band would need to submit the contract to NIGC for approval.
K. APPLICATION OF 3-6-92 MAN-A CEMENT CONTRACT
107. Reference to W-2 summary report forms for GWI for the years 1994 and 1995 (WE Ex. 24, 25), reveal that GWI had no employees at the SSC. Medure Arbit. Tr. p. 851, WE Ex. 24, 25.
108. GWI represented in its federal W-2 filings that it had no employees, but an employment contract between Robert Colaluca and GWI contradicted this assertion. Medure Arbit. Tr. pp. 857-859.
109. Medure denies that Bob Colaluca was ever a shareholder of GWI, but reference to a 1991 GWI Schedule K-l identifies Robert Colaluca as being a 5% owner of GWI. Medure Arbit. Tr. p. 862.
110. Medure was identified as CEO of SSC, which was operated by the WERBC, and the White Earth Tribal Council acted as the Board of Directors to the CEO. Medure Arbit. Tr. p. 870; WE Ex. 34.
111. Medure testified “I’m telling you and the judges, under oath, the $10 million Miller-Schroeder note, which you, Pm sure have, was guaranteed by Gaming World, Ltd., or they would not have got the loan”. Medure Arbit. Tr. p. 898-899. This statement is contradicted by the note which is the sole obligation of WERBC. WE Ex. 66A.
112. In June of 1994, Medure submitted an invoice for reimbursables, including $5,000.00 storage fees. Although no agreement was produced, he submitted the invoice for reimbursement believing he was entitled to an additional $5,000.00 per month. Medure Arbit. Tr. p. 903, WE Ex. 71.
113. In August or September of 1992, Frank Johnson was approached by the Secretary-Treasurer of the WERBC inquiring how much money GWI was saving by not repaying WELSA, by paying GWI’s top employees out of SSC operating expenses, and inquired how WERBC was making up the 10% to GWI. Johnson Ar-bit. Tr. p. 1125; WE Ex. 11.
114. Prior to August of 1992, Frank Johnson, CFO, Shooting Star Casino, was *317 receiving regular inquiries about how much the difference was between the 70/30 and 60/40 split. Johnson Arbit. Tr. pp. 1127,1132.
115. Frank Johnson did not become aware of the reimbursables until July 1992, after BIA disallowed the 60/40, 7 year contract. Johnson Arbit. Tr. pp. 946, 1133,1134.
116. The definition of “operational expenses” which were to be taken off the top, before distribution of profits, was a key part of the formula. The more GWI could expense as “operational” meant more profits to GWI. Angelo Medure worked out the best deal he could by putting all GWI employees on the SSC payroll, which required the WERBC to pay 60% of GWI’s employee costs. Medure Arbit. Tr. p. 740.
L. NOVEMBER 1992 AMENDED MANAGEMENT CONTRACT
117. To remain competitive in the business, in November 1992, GWI and WERBC entered into an amended agreement as a result of a decision to expand the casino by adding hotel rooms, banquet rooms, and swimming facilities. Medure Arbit. Tr. pp. 840, 846.
118. The amended contract of November 1992, sought an extension of the agreement to 7 years, and sought a 65/35 split, with principal and interest payments taken out of operating expenses, except for WELSA payments. Medure Arbit. Tr. pp. 841-843; WE Ex. 12.
119. Medure indicated that GWI sought an additional 5% in the November 1992 amended contract because he personally guaranteed the $10 million Miller-Schroeder note. Medure Arbit. Tr. p. 885. Evidence contradicts this assertion inasmuch as neither GWI nor Medure guaranteed any portion of the $10 million Miller-behroeder note, and the Miller-Schroeder note is dated March 1, 1994. Ex. 65, 66, 66A, 66B, 66C, 66D.
M. GAMING WORLD INTERNATIONAL INITIAL PUBLIC OFFERING
120. Medure took GWI public. In doing so, he developed a prospectus to comply with federal law. Medure Arbit. Tr. p. 885; WE Ex. 40.
121. The prospectus is dated March 1994, and provides the following:
(a) That “net profits” as defined under the management agreement are gross revenues, less operating expenses, capital expenditures and debt service. Medure Arbit. Tr. p. 887; WE Ex. 40, p. 19.
(b) Provides the management fee is based on a percentage of net earnings, which includes debt service principal payments. Medure Arbit. Tr. p. 884; WE Ex. 40, p. 24.
(c) The prospectus affirmatively states the management contract gives the company the right to hire and discharge substantially all employees employed by WERBC, which was not true. Medure Arbit. Tr. p. 889; WE Ex. 40, p. 25.
(d) The prospectus also affirmatively alleges that GWI’s management team occupies offices in SSC’s approximately 70,000 square foot facility. This statement is misleading inasmuch as GWI had no employees at the SSC. WE Ex. 40, p. 32.
(e) The prospectus further indicates that Medure personally guaranteed a $5.5 million Miller-Schroeder note secuied by a second mortgage on the casino. This statement is unsupported by the evidence. See WE Ex. 66, 66A, 66B, 66C, 661), 67, 68, and 68 A.
*318 122. GWI submitted its September 30, 1995 annual 10K/A report to the Securities Exchange Commission (SEC) in which it made a number of representations. Me-dure Arbit. Tr. pp. 893-896; WE Ex. 47. Those representations were:
(a) The Band is guaranteed an annual income of at least $120,000.00, which must be paid to the Band prior to any payment toward any management fee. This payment has not been paid. Medure Arbit. Tr. p. 895.
(b) The SEC filing affirmatively indicates that the management company has a total of 105 full-time employees, even though the W-2 summary forms indicate only 5 employees for 1995. Ex. 47, p. 21; WE Ex. 25.
123. The SEC filings in 1995, do not indicate any existing guarantees of Me-dure or GWI of any outstanding obligations of SSC. WE Ex. 47.
124. There is nothing in the 1995 GWI 10K/A filing which would indicate a personal guarantee by Medure or GWI of the $10 million Miller-Sehroeder note. Me-dure Arbit. Tr. pp. 897-898; WE Ex. 47.
125. Exhibit 42, the 4-color glossy brochure of GWI Management team members, was developed for enticing potential investors to buy stock in GWI. The representation of the individuals being on GWI management team was false and misleading. Medure Arbit. Tr. pp. 916-921.
N. PROFIT SPLIT METHODOLOGY REMAINED CONSTANT FROM NOVEMBER 1991 THROUGH AUGUST 1996
126. Over the course of the relationship between GWI and WERBC, GWI received $10,153,000.00 in profit distributions. Johnson Arbit. Tr. p. 1047; WE Ex. 48 (amount paid column).
127. The methodology used to split net profits between GWI and WERBC was devised by David Richards, Chief Financial Officer of GWI, and Frank Johnson, CPA, now CFO for WERBC. The general concept was to determine at the end of each month how much cash was available after paying all operating expenses, including principal and interest on construction debt. This method was used to calculate distributions from November 1991, when the temporary casino opened, throughout the course of the agreement, with the exception of the repayment of the WELSA note. Johnson Arbit. Tr. pp. 1061-1071; WE Ex. 76.
128. The methodology used for determining the profit distribution remained the same even after the Miller-Sehroeder financing was in place. Johnson Arbit. Tr. p. 1073.
129. The terms of the March 6, 1992 contract requiring payment of capital investments out of operations were consistent with the methodology devised by David Richards in November of 1991. Johnson Arbit. Tr. p. 1106.
130. Following the BIA’s rejection of the 60140 split contract, Chairman Wadena asked Frank Johnson whether or not the SSC could pay some expenses for Gaming World to make up the additional 10%. Johnson Arbit. Tr. pp. 1133-1134.
131. Only after March 6, 1992, did the issue of reimbursables come to light. Re-imbursables were a method of increasing the distributions to GWI to make up the 10%. Johnson Arbit. Tr. pp. 1132, 1133.
132. GWI obtained $77,987.19 per month in excess distribution as a result of not paying back the WELSA note as specifically provided in the March 6, 1992 contract. Johnson Arbit. Tr. p. 1138; Ex. 11, p. 15.
*319 133. The auditors raised the question about paying GWI employees out of SSC payroll in their audit for fiscal year 1992. The auditors requested a representation letter affirming it was legal to pay GWI salaries out of SSC funds. The language of the representation letter (GWI Ex. 32) would have come from the outside auditors. Johnson Arbit. Tr. p. 1148.
134. In May 1993, Frank Johnson became aware of the amendment to the management contract (after the fact) amending the profit split from 70/30 to 65/35. Johnson Arbit. Tr. p. 1150.
135. The terms of the March 6, 1992 contract were never followed by GWI or WERBC. It is clear, however, that the only approval, if valid, was to the specific terms of the March 6, 1992 contract. No amendments were approved. WE Ex. 41.
O. INDICTMENTS OF WADENA, CLARK AND RA WLEY
136. On August 29, 1995, Darrell “Chip” Wadena, Jerry Rawley and Rick Clark, Chairman, Secretary-Treasurer and District I Councilman, respectively, of the White Earth Band of Chippewa Indians, amongst others, were charged in a 43-count indictment for activities occurring from April 1991 through March 1994, for conspiracy, to defraud the White Earth Band in the construction of the casino which was financed in part by tapping the WELSA funds. WE Ex. 43.
137. In September 1995, the Tribal Council drew money on the SSC account to pay for attorneys’ fees to defend the Tribal Council members, which attorneys’ fees amounted to approximately $800,000.00. Vizenor Arbit. Tr. p. 1340; WE Ex. 60, 61, 62, 63 and 64.
138. The indictments were based on the willful misapplication of tribal funds, theft, bribery, and misapplication concerning programs receiving federal funds. WE Ex. 43, p. 5.
139. The methods used to misapply tribal funds were through bid rigging in December of 1993, at which time GWI was under contract to provide construction supervision. WE Ex. 43, p. 12; WE Ex. 9, 2(A)(E).
140. On June 24, 1996, Wadena, Clark and Rawley were convicted of 15, 23, and 17 felony counts, respectively, in Federal District Court. WE Ex. 43.
141. On August 12, 1996, Medure’s employment with SSC was terminated. Medure acknowledged that he was an employee of the SSC by sending a letter indicating that he was ready and willing to fulfill his position as an employee of SSC. Medure Arbit Tr. p. 871; WE Ex. 35.
142. In November 1997, Medure settled a lawsuit against U.S. News and World Report. A sum of $3.712 million was deposited in the GWI bank account on November 25, 1997. On the same day, GWI and Angelo Medure made payments as consulting fees to companies that he controlled (RoMed Construction $510,000.00; Northern Paving $180,000.00; West Penn Asphalt $570,000.00) and individuals, including Ron Cook ($30,500.00), David Richards ($55,000.00), Ed Donafrio ($16,700.00), Barb Leuben ($7,500.00), Manny Marcos ($9,400.00), Ray Wirzman ($5,000.00), and Raymond Cook ($7,000.00). In addition, he made simultaneous payments to Angelo Medure ($613,000.00 and $9,000.00); Anthony Medure ($66,000.00); Charlotte Medure ($91,000.00). Medure indicated the payments were made for work they had done prior to the termination of the management agreement with WERBC in August 1996. Medure Arbit. Tr. pp. 1266-1272.
143. Medure indicated in November of 1997, GWI had no employees, but yet he *320 paid consultant fees to a number of former employees upon settlement of the libel case. Medure Arbit. Tr. p. 1266.
144. Medure was aware that neither the March 6, 1992 contract, nor the November 1992 modification were ever approved by NIGC. Medure Arbit. Tr. pp. 1274, 1278,1282.
145. On August 12, 1996, when GWI was terminated as manager of the SSC, the casino was in a state of disrepair. The hotel had not been maintained, machines were out of date, and carpeting was in need of repair. Vizenor Arbit. Tr. p. 1350.
146. The arbitration panel consisting of Arbitrators Robert J. Sheran, Lawrence R. Yetka and Douglas K. Amdahl found that Darrell “Chip” Wadena and Angelo Medure were complicitous in unlawful acts committed by Darrell Wadena.
147. The Arbitrators further found that the piecemeal actions of the contracts leading principals, Chip Wadena and Angelo Medure established a conspiracy of unlawful means and unlawful goals.
148. The Arbitrators further found that the actions of Angelo Medure and Darrell “Chip” Wadena were piecemeal and contrary to lawful objectives and demonstrated further evidence of an agreement to benefit Mr. Medure and Mr. Wadena at the expense of the White Earth Band of Chippewa’s legitimate interests.

CONCLUSIONS OF LAW

149. That the March 6, 1992 contract is null, void, and unenforceable for the following legal reasons:
(a)The contract is null and void under the White Earth common law principles, contrary to public policy, and amounts to a sham contract;
(b) The contract is null and void under common law principles of uncon-scionability; and
(c) The contract is null and void because it did not receive the approval of NIGC or he BIA as required by federal law. 25 U.S.C. § 2711; 25 U.S.C. § 81; 25 C.F.R. § 533.7; WE Ex. 41.
150. Gaming World International has received reasonable compensation for the services it provided in the management of the casino.
151. The corporate veil of Gaming World International, Ltd. is pierced on the basis that Gaming World International, Ltd. was the alter ego of Angelo Medure at the time of entering into the contract and that failing to pierce the corporate veil would be inequitable, result in injustice and be fundamentally unfair.
152. The Intervenor Plaintiffs and Plaintiffs Amended Motion for Partial Summary Judgment is granted.
153. The Intervenor Plaintiff and Plaintiff are entitled to the relief authorized under 25 U.S.C. § 81 as it existed in 1992, when the contractual relationship was entered between GWI and Angelo Me-dure and the White Earth Band.
154. The Clerk of Court is hereby ordered to schedule the matter for a hearing within sixty (60) days to determine what amount of money was paid to Angelo Me-dure and/or GWI in excess of the amount approved by the Commissioner or the Chairman of NIGC. 25 U.S.C. § 81.

MEMORANDUM

The motion before the Court is a partial summary judgment motion brought by the Plaintiffs. The Plaintiffs are seeking the following:
1) A declaratory judgment ruling that the alleged management contract dat *321 ed 3/6/1992 is null and void as a matter of law;
2) That the alleged management contract dated 3/6/92 is null and void on common law principles including contract formed under duress, a contract contrary to public policy and that the contract is a sham;
3) A ruling as a matter of law that the corporate veil of Gaming World Inc. (GWI) is pierced on the basis that GWI was an alter ego of Angelo Me-dure and that failing to pierce the corporate veil would be inequitable, result in injustice and be fundamentally unfaii*.
Motion for Summary Judgment
A. According Rule XVII of the White Earth Band of Chippewa Rules of Civil Procedure, summary judgment should be granted if it appears that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The Defendants failed to meet their burden of identifying specific facts that are in dispute and the Plaintiffs have proven that they are entitled to judgment as a matter of law.
The Plaintiffs have moved for summary judgment and supported that, motion with extensive cites to factual assertions from the record which remain uncontested by the Defendant. Once a motion for summary judgment is made and supported the burden is placed on the nonmoving party to go beyond the pleadings and to designate specific facts which show that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It is the burden of the nonmoving party to “do more than simply show that there is some metaphysical doubt as to the material fact.” Matsushita Elec. Industrial, Co. v. Zenith Radio Carp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Simply alleging “the mere existence of some factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment”. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rather, a motion for summary judgment requires the Court to view the record as a whole. The Defendant’s response to the motion for summary judgment did not identify any disputed facts. The Defendant’s brief challenged this Court’s jurisdiction and challenged the motion on a theoretical level but did not identify* any specific facts that are a genuine issue in this ease. A genuine issue of material fact is one where, “if the record, viewed as a whole, could lead a rational trier of fact to find for the non-moving party”. Geoscan, Inc. of Texas v. Geotrace Technologies, Inc., 226 F.3d 387, 390 (5th Cir.2000). Moreover, this Court must “view the facts and the inferences to be drawn therefrom in the light most favorable to the non-moving party.” Id.
When a party opposing summary judgment fails its burden, summary judgment may and should be granted if the moving party otherwise satisfies the requirements set forth in the rule. A party resisting a motion for summary judgment has the responsibility of presenting competent, admissible evidence by affidavit or other comparable means. Spier v. Power Concrete, Inc., 304 N.W.2d 68 (N.D.1981). A non-moving party must draw the Court’s attention to evidence in the record by setting out the page and line in depositions or other comparable document containing testimony or evidence raising a material factual issue or from which the Court may draw an inference creating a material fac *322 tual issue. First National Bank of Hettinger v. Clark, 332 N.W.2d 264, 267 (N.D.1983). Furthermore, in a summary judgment proceeding, the Court has no obligation, judicial duty or responsibility to search the record for evidence opposing the Motion for Summary Judgment. Defendants did not dispute Plaintiffs recitation of undisputed material facts which were collected from the voluminous records presented during the Arbitration in December, 2001.
Based on materials submitted and left undisputed by the Defendants, the Court has made the following conclusions of law as follows:
Validity of Qui Tam Provision
A. The 2000 Amendment to 25 U.S.C. § 81 does not apply retroactively and is therefore an appropriate course of action by the White Earth Reservation Business Council (WERBC).
25 U.S.C. § 81, prior to the 2000 amendments, states that
[n]o agreement shall be made by any person with any tribe of Indians for the payment or delivery of any money or other thing of value ... unless such contract or agreement be executed and approved as follows: 1) Such agreement shall be in writing, and a duplicate of it delivered to each party. 2) It shall bear the approval or the Secretary of Interior and the Commissioner of Indian Affairs endorsed upon it... .All contracts or agreements made in violation of this action shall be null and void, and all money or other thing of value paid to any person by any Indian or Tribe, ... on account of such services, ... may be recovered by suit in the name of the United States in any Court of the United States.
25 U.S.C. § 81 (1958). The requirement of approval of all contracts relating to Indian lands has been required since 1872.
Previous court rulings have held that amendments or new statutes “should not be applied retrospectively to cases pending on date of its enactment if ... manifest injustice would result” or “if it adversely affects a party’s vested rights.” National Wildlife Federation v. Marsh, 747 F.2d 616, 619-620 (11th Cir.1984). Furthermore, the U.S. Court of Appeals heard a case specifically involving a contract dispute under 25 U.S.C. § 81 and whether its qui tam provision applied retroactively. U.S. ex rel. The St. Regis Mohawk Tribe v. President R.C. et al., 451 F.3d 44 (2nd Cir.2006). The U.S. Court of Appeals approved the District Court’s ruling that specific to 25 U.S.C. § 81, the 2000 Congressional amendments are not to be applied retroactively. Similar to the contract at issue in The St. Regis Mohawk case, the contract here was signed prior to the 2000 amendments to 25 U.S.C. § 81. The contract at issue was signed on March 6, 1992. Both parties were fully aware of the qui tam provision when they entered into the contract. Accordingly, the provisions of 25 U.S.C. § 81 which were in effect on March 6' 1992, govern this transaction.
Validity of the contested Management Contract dated March 6,1992
A. The Contract dated March 6, 1992 is unenforceable, null and void as a matter of law because it was not approved by the Secretary of Interior or the National Indian Gaming Commission (NIGC).
25 U.S.C. § 81, as it read prior to the 2000 amendments, required approval from the by the Secretary of Interior and the Commissioner of Indian Affairs. This responsibility was vested by Congress under the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 et seq., with *323 NIGC which was established in 1993. However, when 25 U.S.C. § 2701 et seq. was passed, the NIGC did not exist. As such, all gaming contracts were subject to the review and approval of if the Area Directors of the Bureau of Indian Affairs (BIA) until the NIGC could be established. In 1989, 43 C.F.R. 4.314 was passed and reads as follows:
Exhaustion of Administrative Remedies
(a) No decision of an administrative law judge or an official of the Bureau of Indian Affairs, which at the time of its rendition is subject to appeal to the Board, shall be considered final so as to constitute agency action subject to judicial review' under 25 U.S.C. $ 704, unless made effective pending decision on appeal by order of the Board.
Since the WERBC and GWI appealed the decision, the Earl Barlow’s approval of the contract on 3/6/1992 was not the final decision. The Area Director’s decision was provisional on a ruling by the Interior Board of Indian Appeals (IBIA). The IBIA reversed Bai'low’s decision and remanded it to the NIGC for “further consideration”. White Earth Band of Chippewa Indians, 23 I.B.I.A. 216, 227 (Mar. 3, 1993). The NIGC was thus responsible for approving the contract. The NIGC did not review this contract until 1996, at which time it was rejected.
B. The Contract is not void under common law principles of duress.
The Plaintiffs assert that GWI and WERBC signed the contract only because Barlow issued an ultimatum on the contract. WE Ex. 83, Depo. of Lou Pom-erico 4-13-99. Despite pleas by both the White Earth Band of Chippewa (Band) and GWI, Barlow, following federal guidelines, insisted that the parties operate at a 70/30 split for a period of 5 years. WE Ex. 51.
The Restatement of Contracts offers two definitions of duress,
(a) any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition, or
(b) any wrongful threat of one person by words or other conduct that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment, if the threat was intended or should reasonably have been expected to operate as an inducement.
Restatement (Second) of Contracts § 175, (1981). The standards for duress require more than a Hobson’s choice. Duress requires an unreasonable alternative. There were alternatives open to both parties. Furthermore, even if Barlow’s actions constituted an improper threat, as a third party to the contract, the contract would only have been voidable if the other party was unaware of a threat. Here, both parties were present and fully aware of Barlow’s “take it or leave it proposal”. It is clear that the actions of Earl Barlow on behalf of the BIA and the subsequent signing of the contract do not meet the common law requirements for duress or undue influence.
C. The Contract is voidable under the common law principle of un-conscionability and fraud and as a matter of public policy.
a. Unconscionability
The primary reason behind the federal government’s regulation of all contracts is because throughout history, the United States government considered itself the “great father” to Indian nations. *324 Cherokee Nation v. State of Georgia, 30 U.S. 1, 5 Pet, 1, 8 L.Ed. 25 (1831). This protective attitude is reflected in a multitude of federal laws, including IGRA. The purpose of the limits on the net revenue split was to ensure that Indian tribes were not taken advantage of by management corporations and to shield tribes from organized crime or other corrupting influences while ensuring they benefit from gaming revenues. 25 U.S.C. § 2702.
Neither party contests that Barlow refused to sign any contract prior to the negotiations on 3/2/92, which entitled GWI to a 60/40 split over 7 years because Barlow did not find that the contract met the minimum criteria for the split as required by IGRA. Under IGRA, the criteria for a 60/40 split over a 7 year term required the following:
1) The management company must have the majority of risk in the project.
2) The payback on the total capital investment (i.e. loans, notes, etc.) must be considered an operating expense prior to determining the distribution of net revenues.
3) The term of the agreement must be equal in length to the terms of any equipment leases or loan periods that are the responsibility of the management contract.
WE Ex. 51. Without these considerations, Congress believed there to be no reason for such contractual obligations. Barlow was protecting the Band from entering into a contract that was fundamentally unfair by its very terms. Unconscionability is defined as “extreme unfairness”. Black’s Law Dictionary 742 (3rd Pocket ed.2001).
When the Court encounters a eon-tract that is extremely unfair, it has the discretion to refuse to enforce a contract. Restatement (Second) of Contracts, § 208 (1981). However, even with the terms of the contract as they were, it is clear that even prior to the 3/6/92 negotiations that GWI was not operating or planning to operate the Shooting Star Casino. It is difficult to ascertain what services GWI was providing to the Casino based on the plethora of evidence submitted by the Plaintiffs. GWI’s performance in light of that which was required in the contract demonstrates a gross disparity in the values exchanged between the two parties. Furthermore, it would be poor precedent not to find the terms of the contract unconscionable given the extensive record provided by the Plaintiff. As a matter of public policy, it is important to the integrity of the tribe to ensure that all business dealings and contractual obligations are substantively fair for both parties.
b. Fraud
The Restatement (Second) of Contracts § 164 (1981) states that,
If a party’s manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction.
The Plaintiff has stated and the Respondent’s failed to contest that the representations made to Earl Barlow both prior to and during the negotiations of the 3/6/92 contract were false. During negotiations, GWI specifically agreed to the following:
1) Provide services to improve, develop, manage and maintain the property known as Shooting Star.
2) Be responsible for all gaming and related activities, materials, equip *325 ment, furnishings, fixtures, tools, maintenance and other support items necessary to operate the casino.
3) Select employees for management positions, including three appointed by the Band and to provide training aid and personnel to conduct programs of instruction.
4) Be responsible for all hiring and firing decisions.
5) Be responsible for all business affairs, including the development, financing, improvement, management and maintenance of the enterprise.
The record shows that both parties ignored these provisions. The Plaintiffs provided clear and convincing evidence, with no response from the Respondent’s refuting this, that GWI did not employ personnel or guarantee the employee’s salaries for five years. Furthermore, the total amount of work that was left uncompensated was GWI’s $41,881.00 cash investment which went towards a bathroom remodel at the temporary casino facility. Erma Vizenor testified during the arbitration process in 2001 that after cancelling the contract with GWI, the Tribal Council stepped in and made over $3 million dollars in repairs and updates to machines required to be maintained by GWI under the 316/92 contract. Vizenor Arbit. Tr. pp. 1349-1350. There is also sufficient and undisputed evidence that fraudulent activities including bid-rigging and the failure to repay WELSA funds occurred in order to benefit Rick Clark, Darrell “Chip” Wadena and GWI. White Earth Ex. 43, p. 12; White Earth Ex. 9, 112(a)(e); Medure Ar-bit. Tr. pp 805-811. The representations made to Earl Barlow at the time he signed the provisional contract and rejected by the NIGC in 1996, meet the requirements of fraud. Therefore, this Court finds that the actions were fraudulent and the contract voidable.
Piercing of the Corporate Veil
D. The Corporate Veil of GWI Should Be Pierced to Allow the Recovery of Illegal Profits Taken by Angelo Medure.
The concept of piercing the corporate veil is equitable in nature. As noted by the court in Erickson-Hellekson-Vye Co. v. A. Wells Co., 217 Minn. 361, 15 N.W.2d 162 (1944):
[disregarding the legal concept that a corporation is a distinct entity, courts of equity have repeatedly held that where an individual owns all, or practically all, the stock of a corporation, the corporation and such individual will be regarded as one and the same if the equities of a case so require.
217 Minn. at 381-82, 15 N.W.2d at 173. See also In re Warner’s Trust, 263 Minn. 449, 117 N.W.2d 224 (1962); General Underwriters, Inc. v. Kline, 233 Mimi. 345, 233 Minn. 345, 46 N.W.2d 794 (1951); In re Will of Clark, 204 Minn. 574, 284 N.W. 876 (1939).
The practice of piercing the corporate veil is generally a creditor’s remedy used to reach an individual who has used a corporation as an instrument to defraud creditors. See G.G.C. Co. v. First National Bank of St. Paul, 287 N.W.2d 378 (Minn.1979). The standard of review of a District Court’s exercise of equity is abuse of discretion; an abuse of discretion is shown if the Court disregarded the facts or applicable principles of equity. Edin v. Jostens, Inc., 343 N.W.2d 691, 693 (Minn. App.1984). Courts will pierce the corporate veil if an entity ignores corporate formalities and acts as the alter ego or instrumentality of a shareholder and the liability limitations of the corporate form results in injustice or is fundamentally unfair. Victoria Elevator Co., Inc. v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. *326 1979) (listing several factors supporting alter ego or instrumentality finding),
The Arbitrators found that Angelo Medure and GWI were complieitous in unlawful acts regarding contract performance. The Arbitrators found,
[t]he piecemeal actions of the contract’s leading principals, Chip Wadena and Angelo Medure, establish a conspiracy of unlawful means and unlawful goals. During the significant years covered by the March 6, 1992 contract, Mr. Wade-na was in effective control of the White Earth Tribal Council and of the interests of the White Earth Indian Reservation. An appeal from the contract approved by Mr. Barlow, a contract favoring the Tribe, was taken not by [GWI] but by the Wadena-controlled Tribal Council. Such actions, piecemeal and contrary to lawful objectives, are further evidence of an agreement to benefit Mr. Medure and Mr. Wadena at the expense of the [WERBC’s] legitimate interest.
Award of Arbitrators, May 23, 2002. GWI was an instrumentality or “alter ego” of Angelo Medure and together they conspired to strip the profits of the casino and deprived the people of White Earth of repayment of the WELSA economic development fund. The first prong of the test has been met.
Although aware that any management contract required approval from NIGC and/or BIA, Angelo Medure and GWI continued to engage in withdrawing millions of dollars from the Shooting Star Casino in spite of an unapproved contract and in spite of having no employees at the casino. In spite of the contract provision indicating GWI managed the Casino, Medure abdicated that responsibility and became the employee of the Gaming Commission. Angelo Medure admits from day one he and GWI were subject to the control of WERBC, Gaming Commissions, who he referred to as his boss. Medure Arb. Tr. p. 762.
In spite of having no employees on the Shooting Star Casino premises, Medure created a 4-color brochure identifying a management team of GWI to entice people to invest in his initial public offering. WE Ex. 40, Bates # 707-774. According to the 3-6-92 contract, GWI was charged with the responsibility of development, financing, and improvement of the facility, the only out-of-pocket expense made by GWI was the cost of remodeling bathrooms in a temporary facility for a sum of $41,881.00.
After the BIA required a 70/30 split, GWI, Medure and Darrell Chip Wadena devised a scheme to increase distributions to GWI to make up the 10%. (W.E. Ex. 11, Bates # 480-519) Finally, to clearly demonstrate Medure’s use of GWI as an instrument of fraud, after settling a lawsuit against U.S. News and World Report, a sum of $3,712 million was deposited in the GWI bank account on November 25, 1997. On the very same day, GWI and Angelo Medure made payments as “consulting fees” to construction, paving, and aggregate companies he controlled (RoMed Construction $510,000.00; Northern Paving $180,000.00; West Penn Asphalt $570,000.00) and individuals, including former SSC General Manager Ron Cook ($30,500.00), David Richards, GWI CFO ($55,000.00), Ed Donafrio, SSC Employee ($16,700.00), Barb Leuben, houser-nate and SSC Employee ($7,500.00), Man-ny Marcos, SSC Employee ($9,400.00), Ray Wirzman, SSC Employee ($5,000.00), and Raymond Cook, SSC Employee ($7,000.00). In addition, he made simultaneous payments to himself, Angelo Medure ($613,000.00 and $9,000.00); Anthony Me-dure (uncle) ($66,000.00); Charlotte Me-dure (wile) ($91,000.00). Medure indicated the payments were made for work they *327 had done for GWI prior to the termination of the management agreement with WERBC in August 1996. Medure Arb. Tr. pp. 1266-1272, Bates # 295-297.
These facts adequately and sufficiently show that GWI was the alter ego of Angelo Medure. After hearing five days of testimony, the Arbitrators said it most succinctly when they found a conspiracy of unlawful purposes and unlawful means between Medure and Darrell Chip Wadena to deprive WERBC of their rightful due under the casino management contract. GWI was insolvent and unable to make any payments on a judgment as of December 1997. Medure Tr. pp. 1263-1269.
Finally, the White Earth Nation has seen its White Earth Land Settlement Act economic trust fund funneled out of the reservation into the hands and pockets of Angelo Medure who created a corporate shell to give the appearance of legitimacy. Angelo Medure conspired with Gaming World International to deprive the People of White Earth the benefits of gaming. Implicit in the common law of White Earth is the concept of good faith and fair dealing, which is absent from the undisputed facts of this case.
Jurisdiction
Pursuant to the White Earth Band of Chippewa Judicial Code, the White Earth Tribal Court possesses general civil subject matter jurisdiction. White Earth Judicial Code, Chapter II § 1(c), (e). The White Earth Band of Chippewa Judicial Code states that the Court shall have jurisdiction over all Band members and over all persons involved with the White Earth Band of Chippewa or individual members of the Band, through commercial deals, contracts, leases and other arrangements. The definition of person under the Judicial Code extends to “a natural person, corporations, joint ventures, partnerships, trusts, trust funds, public or private organizations, or any business entity of whatever kind, whether members or non-members of the Band”. White Earth Band of Chippewa Judicial Code, Chapter 2, § 1(c). The White Earth Band of Chippewa Judicial Code specifically notes that civil causes of action, including contracts and “all claims based upon commercial deals with the Band, its agencies, sub-entities, and corporations”. White Earth Band of Chippewa Judicial Code, Chapter 2, § 1(e).
The judicial code expressly targets the three issues the Plaintiffs have brought before the Court: validity of contracts under U.S. law, the validity of contracts under common law, and piercing the corporate veil. The question this Court must also address is whether federal case law might serve to limit this Court’s jurisdiction.
Tribal courts are presumed to have civil jurisdiction over the activities of non-Indians on fee lands. Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 107 S.Ct. 971, 94 L,Ed.2d 10 (1987). However, federal case law has limited a tribal court’s jurisdiction. In order to determine whether federal law has limited this Court’s jurisdiction, this Court must look to federal limits to this presumptive civil jurisdiction.
Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493, (1981) served to limit the civil jurisdiction of tribal courts in cases involving non-Indian parties. Montana specifically earved out two exceptions to this general rule, stating that “Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands, and tribe may regulate ... [the] activities of nonmembers who enter consensual relationships with tribe or its members, through commercial dealing, contracts, leases or other arrangements.” However, *328 this decision was further limited by Strate v. A-1 Contractors, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661, (1997) in which the Supreme Court ruled that personal consensual relationships are insufficient and that consensual relationships must be commercial in nature.
The letter of intent, the negotiations of various contracts culminating in the contract that received provisional approval demonstrate a consensual, commercial i-elationship that is required by Montana, 450 U.S. at 565, 101 S.Ct. 1245 and Strate, 520 U.S. at 457, 117 S.Ct. 1404. It is indisputable that GWI did provide some, albeit minimal, services to the Shooting Star Casino under the presumption of a contractual agreement. (Cook Arbit. Tr. pp. 156; Johnson Arbit. Tr. pp. 1045-1046; Vizenor Arbit. Tr. p. 1350) Moreover, the provision of services like the restroom facilities at the temporary casino site in exchange for net revenue distributions is a prime example of a consensual, commercial relationship and thus meets the criteria established by Montana, 450 U.S. at 565, 101 S.Ct. 1245 and which have been upheld by the Supreme Court since 1981.
However, even if the federal courts were to determine that the commercial negotiations of the Shooting Star Casino do not meet the first Montana exception, it is unambiguous to this Court that the transactions between GWI and the WERBC fall squarely within the second Montana exception. The Montana opinion also states that, “[an] Indian tribe may retain inherent power to exercise civil authority over conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, economic security or health or welfare of the tribe.” Montana, 450 U.S. at 566, 101 S.Ct. 1245. It is the economic security of the tribe that is uniquely threatened by the conduct of GWI.
When the WERBC decided to open a casino in 1990, it did so with the aid of the White Earth Reservation Land Settlement Act of 1985 (WELSA). WELSA was a legislative resolution passed by the United States Congress which effectively settled all pending and future lawsuits involving certain allotted lands on the reservation. Its purpose was not only to settle uncertainty that existed between the White Earth Band, Indian, and non-Indian communities, but also to provide means for the economic development of the White Earth Tribe. The money set aside for the tribe’s economic development is invested and managed by the Secretary of the Interior and is to be used solely to ensure the Band’s economic survival. There is no doubt that the underlying purpose for receiving the economic development funds was to reimburse a tribe devastated by illegal allotment and titles transactions during the 1900’s. Not all the acreage taken from the tribe could physically be reconstituted as tribal lands and as a result, Congress provided the Tribe with a sizable sum to be used for their benefit.
Shooting Star has since been a vital asset to the tribe since its inception, and over the past few years has brought in more than six million dollars in revenue. The money the tribe pulls in from the Shooting Star Casino supports the White Earth Tribal Police, Natural Resources and other Tribal Council programs. It is also used for scholarship funds, elder programs and other aid that directly benefits the White Earth Band members. The Casino is also one of the Band’s primary employers. Currently, the Casino employs more tribal members than the Tribal Council. The Casino employs a total of 473 Native Americans, or 53.03% of their employees. Of these employees, 434 are *329 enrolled or are the descendents of enrolled Tribal members.
The Casino is clearly the most important economic resource for the tribe. The gross misconduct which occurred between 1991 and 1996 and the resulting state of the casino demonstrate how extensive GWI and Chairperson Darrell “Chip” Wadena’s actions affected the Casino. Tribal members had no access or input regarding how the Casino was built or the conditions of the contract. Vizenor Arbit. Tr. pp. 1313-1319. Following the conviction of Chairperson Wadena and the termination of the relationship between GWI and the Shooting Star Casino, the newly elected Tribal Council determined that the gaming machines were outdated and the property had not been maintained. In order to restore the Casino, the Tribal Council had to pay approximately $3 million. Vizenor Arbit. Tr. pp. 1349-1350. They also paid an additional $1 million for a customer tracking system. Moreover, GWI’s mismanagement of the Shooting Star Casino left the Tribe worse off finan-dally, stating that as of 2001, the Tribe was still paying off the debt and struggling to recover from the actions of GWI and Chairperson Wadena. Vizenor Arbit. Tr. pp. 1357-1358.
The actions of the Defendant’s were evi-dentially detrimental to the economic improvement and stability of the Tribe. WELSA was supposed to help stabilize tribal members economically after the loss of more than 800,000 acres of land. The fraudulent actions of GWI and the Tribal Council threatened this and based on these facts, it is clear that the White Earth Tribal Court has inherent jurisdiction over this matter and non-Indian defendants.